170 F.3d 734
 79 Fair Empl.Prac.Cas. (BNA) 584,
75 Empl. Prac. Dec. P 45,787
Leon JOHNSON, Plaintiff-Appellant,
v.
ZEMA SYSTEMS CORPORATION, a Delaware corporation, doing
business as Chicago Beverage Systems, Inc., and
Coors Distributing of Illinois,
Defendants-Appellees.
 No. 98-1359.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 13, 1998.
Decided March 16, 1999.
 
 Christopher T. Hurley, Mark McKenna (argued), Christopher T. Hurley & Associates, Chicago, IL, for Plaintiff-Appellant.
 Christopher G. Walsh, Jr. (argued), Roger J. Guerin, Rothschild, Barry & Myers, Chicago, IL, for Defendants-Appellees.
 Before CUMMINGS, ROVNER, and DIANE P. WOOD, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 Leon Johnson, a 44-year-old male African-American, was fired from his job as vice president of sales and marketing for Zema Systems Corporation ("Zema"), a beer distribution company. Johnson brought claims of racial discrimination, age discrimination, and retaliatory discharge against Zema. Magistrate Judge Ronald A. Guzman, to whom District Court Judge Nordberg referred the matter, recommended granting summary judgment to Zema on the grounds that Johnson had failed to provide sufficient evidence to sustain a prima facie case on any of the claims. Judge Nordberg adopted the magistrate judge's recommendations over Johnson's objections and granted summary judgment for Zema. In so doing, Judge Nordberg refused to consider Johnson's objections, believing them to lack the specificity required for objections to a magistrate judge's report.
 
 
 2
 On appeal, an initial question is whether Johnson's objections in the district court were insufficiently specific so as to constitute a waiver of his objections on appeal. We conclude that they were sufficient. Looking to the substance of the appeal, whether summary judgment on Johnson's three claims was appropriate, we affirm the grant of summary judgment on the claims of age discrimination and retaliatory discharge and reverse summary judgment on the claim of racial discrimination.
 
 Background
 
 3
 Defendant Zema distributes Miller Brewing Company products throughout the City of Chicago. Zema began its distribution business through the acquisition of a company which distributed Miller products on the north side of Chicago. Zema operated this north side distribution company under the name Chicago Beverage Systems ("CBS"). In 1985, Zema purchased the assets of another company which distributed Miller products on the west and south sides of Chicago under the name Illinois Beverage Inc. ("IBI").
 
 
 4
 CBS maintained a predominantly white work force; IBI had a predominantly African-American work force. In 1987, Zema moved IBI's operations to the same facility in which CBS was housed. The two companies maintained separate legal identities and different managements until a merger of the two companies in July 1991. The newly merged entity operated under the name Chicago Beverage Systems.
 
 
 5
 In April 1991, shortly before the merger, plaintiff Johnson was first contacted by Zema's president and majority owner, J. Christopher Reyes, about the possibility of joining Zema as Vice President of Sales and Marketing for IBI. At that time, Johnson worked for Miller Brewing Company, for whom he had been employed for eight years. For the preceding five years, Johnson had been an area sales manager for Miller, first in Corpus Christi, Texas and then in Chicago. As an area sales manager, Johnson had monitored and assisted Miller's distributors in marketing and selling Miller's beer products.
 
 
 6
 Johnson agreed to join Zema in June 1991 as Vice President of Sales and Marketing for IBI. At the time of his hire, Johnson was 41 years old. A month after Johnson was hired, Zema merged IBI with CBS. As noted above, the merged distributorship retained the name Chicago Beverage Systems. James Doney, who had held the position of Vice President of Sales and Marketing for the pre-merger Chicago Beverage Systems, assumed the title of Vice President and General Manager. Johnson became Vice President of Sales and Marketing for the newly merged entity.
 
 
 7
 At CBS, Johnson supervised a sales staff of approximately 35 employees in the distribution of around eight million cases of beer per year. He also designed and implemented marketing and promotional programs for Miller products in the Chicago area. After three years at CBS, Johnson was terminated in October 1994. The reasons for and the circumstances surrounding this termination are the subject of this dispute.
 
 
 8
 Zema and Johnson present sharply contrasting views of Johnson's tenure at Zema. Johnson alleges that throughout his time at CBS he consistently met or exceeded his employer's expectations. He relies principally on his 1993 and 1994 performance reviews, each of which spoke in superlatives about the quality of Johnson's work. Johnson also relies on a letter of recommendation President Reyes prepared for Johnson upon his termination in which Reyes called Johnson "a serious and dedicated worker" whose "reliability and integrity are above question." In deposition testimony, Vice President and General Manager Doney indirectly testified to Johnson's satisfactory performance in disavowing Johnson's poor performance as the reason for his termination.
 
 
 9
 This favorable performance, Johnson alleges, occurred despite the racial segregation of the CBS work force and the generally unfavorable treatment African-Americans received at the company relative to their white peers. At CBS, African-American salespersons served predominantly African-American accounts and white salespersons served accounts owned or frequented by whites. As a result, African-Americans received comparably lower pay. Until the spring of 1995, African-American and white salespersons were segregated into separate rooms at Zema's corporate offices. African-American employees were the first to be laid off or fired and the last to be re-hired and were subject to racial epithets. In deposition testimony, former Zema employees testified that the company's warehouse manager and the company's comptroller regularly referred to African-American employees and job applicants as "niggers." On one occasion, an African-American receptionist complained that a Zema employee referred to her as a "nigger." A meeting was convened, Johnson alleges, but no disciplinary action was taken.
 
 
 10
 The supervisorial responsibilities accorded to Johnson, he alleges, mirrored this racial segregation of the work force. In his deposition, Johnson testified that he complained to Reyes and others about the racial disparities at Zema, but for the most part no action was taken. Johnson testified that he reported to Reyes that white employees were using the word "nigger" in the plant and that he objected to the difference in salaries between African-American and white employees. He also complained on those occasions when African-American employees were terminated without justification. When Johnson was initially hired, Zema provided company cars to its two white sales managers and not to its three African-American sales managers. Reyes did heed Johnson's complaint on this account, Johnson notes, providing company cars shortly thereafter to the African-American sales managers.
 
 
 11
 Johnson was fired in October 1994. At the time, neither President Reyes nor Vice President and General Manager Doney provided Johnson with a reason for his termination. In his deposition testimony, Doney stated that Johnson's performance was not the reason for his termination. Neither Reyes nor Doney knew at the time of Johnson's firing whether sales were up or down at Zema. The real reason for his termination, Johnson argues, was his race, his age, and his having complained that others in the company were being mistreated.
 
 
 12
 After Johnson's termination, Vice President Doney, who is white, assumed Johnson's duties. Zema assigned Mark Nolan, also white, as Sales Administrator to assist Doney with paperwork. Two years later, Zema hired Patrick Collins, a 30-year-old African-American to assume some of Johnson's former duties. Collins, however, was limited to supervising African-American salespersons. Doney retained supervisory authority over white salespersons and customers.
 
 
 13
 Zema presents a different picture of Johnson's tenure and eventual termination. Zema argues that Johnson's performance failed to meet its expectations and that his termination is attributable to a desire to flatten its management structure. Though Zema concedes Johnson received favorable annual employment reviews, Zema argues that Johnson's work was marred by his inability to divide his time equally among the sales managers he supervised. In June 1994, President Reyes told Johnson that he should divide his time as supervisor more equally between the sales managers under his watch. Johnson was particularly criticized for spending too much time with Richard Rampich, a sales manager on the north side of Chicago. In deposition testimony, another sales manager testified he had only received three visits to his sales territory during the three-year period in which Johnson was employed as his supervisor. At the time of his termination, Zema argues, Johnson's work performance was unsatisfactory.
 
 
 14
 Zema attributes the segregation of its work force to the historical contingency that the company Johnson worked for resulted from the merger of CBS, which had a predominantly white work force, and IBI, which had a predominantly African-American work force. After the merger, Zema argues, the sales personnel who had worked for IBI remained in the offices built for them on one side of the building and the pre-merger CBS sales force remained on its side of the building. The segregation was not complete, Zema notes, because at least one white sales supervisor, Mike Campagna, was on the IBI side. In 1995, one year after Johnson's termination, when Miller Brewing Company reduced the amount of warehouse space needed for inventory, Zema notes that a common area was constructed bringing all of the post-merger CBS sales personnel together.
 
 
 15
 As for the different treatment of whites and African-Americans, Zema observes that cars were provided to African-Americans and Hispanic sales managers once the disparity was brought to its attention. The difference in salaries between whites and African-Americans at Zema was in the process of being remedied at the time of Johnson's firing, due in no small part, Zema says, to Johnson's intervention. Zema's response to Johnson's allegations that hostile and derogatory comments were directed towards African-Americans notes that Reyes did call a meeting to address one specific incident where an African-American secretary overheard herself referred to as a "nigger" and, in any case, that many of the incidents to which Johnson points occurred years before his termination.
 
 
 16
 Finally, Zema attributes its decision to fire Johnson not to any impermissible motive, but to a desire to cut costs and flatten its management structure. Zema had hired Ray Guerin, a management consultant, in August 1994, about three months prior to Johnson's termination. After surveying the company's operations, Guerin recommended elimination of Johnson's position to improve the communication between the sales force and General Manager Doney. Of particular concern, Zema alleges, was a need to respond quickly to retailers' requests for special price discounts. Prior to the elimination of Johnson's position, a retailer would first ask a salesperson for a discount. The request would proceed from the salesperson to Johnson and then from Johnson to Doney, who alone had the authority to grant such discounts. Guerin recommended elimination of Johnson's position, Zema contends, to speed this process.
 
 
 17
 Our question on appeal is whether on the evidence presented summary judgment for Zema on Johnson's claims of race discrimination, age discrimination, and retaliatory discharge was appropriate. An initial question, however, is whether Johnson waived his right to appellate review by failing to object with sufficient specificity in the district court to the magistrate judge's report and recommendation.
 
 I.
 
 18
 Rule 72(b) of the Federal Rules of Civil Procedure requires a party that disagrees with a magistrate judge's report and recommendation on a dispositive motion to file "written, specific objections" to the report. Under Rule 72(b), the district court judge must make a de novo determination only of those portions of the magistrate judge's disposition to which specific written objection is made. If no objection or only partial objection is made, the district court judge reviews those unobjected portions for clear error. See Goffman v. Gross, 59 F.3d 668, 671 (7th Cir.1995), Campbell v. United States Dist. Court, 501 F.2d 196, 206 (9th Cir.1974).
 
 
 19
 If a party fails to object to a magistrate judge's report and recommendation in the district court, in this Circuit he waives appellate review of both factual and legal questions. Video Views v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir.1986). If a party objects in the district court on some issues and not others, he waives appellate review of the issues to which he has not objected. Lockert v. Faulkner, 843 F.2d 1015 (7th Cir.1988). In this case, Johnson did file objections to the magistrate judge's report and did object to each of the proposed findings which he now asks us to review. Johnson's objections, however, did little more than identify each element of each of his claims and indicate his disagreement with the magistrate judge's proposed disposition. District Judge Nordberg refused to consider Johnson's objections, believing them to contravene Rule 72(b)'s requirement that they be "specific." Our question is whether Johnson's right to appellate review has been waived for this same reason.
 
 
 20
 Johnson's objections contained no citation to the record or to case law and were devoid of analysis as to why Magistrate Judge Guzman's recommendation was in error.[1] For each element of his case, Johnson simply recited the relevant legal standard, stated that Magistrate Judge Guzman found for Zema, and averred that this conclusion was incorrect. Johnson's objection concerning his prima facie case of race discrimination is representative:
 
 
 21
 1. Plaintiff objects to the magistrate judge's finding that plaintiff failed to establish two elements of his prima facie case of race discrimination: that plaintiff met the defendant's legitimate expectations, and that others not in the protected class were treated more favorably. Plaintiff has established a prima facie case of race discrimination. The plaintiff has set forth specific facts which demonstrate the existence of a genuine issue for trial.
 
 
 22
 On the claim of age discrimination, Johnson substituted age for race and repeated the same objection verbatim:
 
 
 23
 2. Plaintiff objects to the magistrate judge's finding that plaintiff failed to establish two elements of his prima facie case of age discrimination: that plaintiff met the defendant's legitimate expectations, and that others not in the protected class were treated more favorably. Plaintiff has established a prima facie case of age discrimination. The plaintiff has set forth specific facts which demonstrate the existence of a genuine issue for trial.
 
 
 24
 Johnson also objected to Magistrate Judge Guzman's conclusions concerning Zema's articulation of legitimate, nondiscriminatory reasons and Johnson's production of evidence from which a reasonable jury could conclude that Zema's proffered reason was pretextual:
 
 
 25
 3. Plaintiff objects to the magistrate judge's finding that defendant has articulated a legitimate, non-discriminatory reason for discharging the plaintiff. The defendant has failed to offer a legitimate, non-discriminatory reason for terminating the plaintiff.
 
 
 26
 4. Plaintiff objects to the magistrate judge's finding that the defendant's stated reasons for terminating the plaintiff were not a pretext for race or age discrimination. The plaintiff has shown that the defendant's claim that he was not performing well at the time of his discharge was a pretext for race and age discrimination. The plaintiff has presented evidence from which a jury could reasonably infer that the defendant's stated reasons for terminating the plaintiff are unworthy of credence.
 
 
 27
 Johnson's objections to the magistrate judge's conclusion on his retaliatory discharge claim were even briefer:
 
 
 28
 5. Plaintiff objects to the magistrate judge's finding that the plaintiff has not established a prima facie case of retaliatory discharge.
 
 
 29
 Johnson's objections do identify with specificity each of the conclusions to which he objects (all of them as it turns out), but do not identify the nature of the magistrate judge's alleged error. From objections like Johnson's, the district court judge knows which issues he is to review de novo, but not what particular lines of reasoning a litigant believes to be incorrect. Our question is whether objections such as these satisfy Rule 72(b)'s requirement that objections to a magistrate judge's report be "specific."
 
 
 30
 We believe Johnson's objections were sufficiently specific to satisfy Rule 72(b). Our interpretation of specific as used in Rule 72(b) understands the term to require a party only to specify each issue for which review is sought and not the factual or legal basis of the objection. This interpretation is supported by the section of the Magistrates Act which defines the powers and jurisdiction of the magistrate judges. The relevant provision reads: "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The language of the statute, referring to "specified proposed findings or recommendations," suggests that a party need only identify the proposed conclusions to which he objects to obtain de novo review in the district court and to avoid waiver of his right to appeal. In adopting Rule 72(b), the Advisory Committee did not seek to make any substantive changes in the statutory command. "Implementing the statutory requirements, the rule requires the district judge to whom the case is assigned to make a de novo determination of those portions of the report, findings, or recommendations to which timely objection is made." Fed.R.Civ.P. 72(b) advisory committee's note (emphasis added). Hence, we understand Rule 72(b)'s requirement of specific, written objection to require a litigant to specify each issue for which review is sought and not the factual or legal basis of the objection.
 
 
 31
 Our holding is consistent with the approach taken by the Sixth Circuit in a series of cases which have considered the degree of specificity required for an objection to a magistrate judge's report. In Howard v. Secretary of Health and Human Services, 932 F.2d 505 (6th Cir.1991), plaintiff's entire objection was "[p]laintiff now specifically objects to the determination of the Magistrate denying Plaintiff's request for relief." Although in filing her objections, plaintiff in that case did advert to a "Brief in support of its Motion for Summary Judgment," no such brief existed. The Sixth Circuit held the objection insufficient to allow appellate review. The plaintiff in Kelly v. Withrow, 25 F.3d 363 (6th Cir.1994), incorporated by reference a previously filed memorandum of law along with his one-sentence objection. Since "the objections directed the district judge's attention to specific issues decided by the magistrate contrary to Kelly's position," id. at 366 (emphasis added), the Sixth Circuit held those objections sufficiently specific. In Neuman v. Rivers, 125 F.3d 315 (6th Cir.1997), by contrast, plaintiff's objections specified only three grounds for objection. The memorandum of law to which the objections referred included a fourth issue, which the Sixth Circuit deemed waived because the district judge was not specifically directed to that issue as a basis for plaintiff's objections. Id. at 322. See also United States v. Sawaf, 74 F.3d 119, 121 (6th Cir.1996) (one-sentence objection allowable given limited nature of legal question presented); United States v. Tortora, 30 F.3d 334, 338 (2nd Cir.1994) (general objection to magistrate judge's findings allowable when no formal report and recommendation ever issued); Soliz v. Chater, 82 F.3d 373, 374 (10th Cir.1996) (plaintiff who specifically identifies certain issues for review does not preserve other issues for review by a catch-all objection). Contrast Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir.1988) (habeas petitioner must quote alleged improper prosecutorial comment in objections to magistrate judge's report when comment not quoted in either habeas petition or brief filed with magistrate judge).
 
 
 32
 In Lockert, 843 F.2d at 1019, this Court said: "Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review." This statement might be understood to require a party filing Rule 72(b) objections to a magistrate judge's report to specify the basis for these objections. In Lockert, however, we considered only whether a party who raises one argument in the district court may raise a different argument in this Court. We concluded that the argument not raised in objections filed with the district court was waived on appeal. In Lockert, we therefore did not have occasion to consider whether an objection which raised several arguments, but failed to provide the basis for these arguments, would satisfy Rule 72(b)'s requirement of specificity.
 
 
 33
 The rationale underlying our holding in Lockert is that absent an appellate waiver rule, a litigant might try to sandbag the district court by presenting for the first time on appeal arguments never raised below. As we wrote in Lockert, "[t]he point of making objections is to tell the district judge--who, under [28 U.S.C.] § 636(b)(1) must make the final decision and enter judgment--what issues the parties actually dispute." Id. at 1019 (emphasis added). In its opinion authorizing the appellate courts to adopt appellate waiver rules for failure to comply with Rule 72(b), the Supreme Court explained the reason for such rules in the following way: "[P]recluding appellate review of any issue not contained in objections prevents a litigant from 'sandbagging' the district judge by failing to object and then appealing. Absent such a rule, any issue before the magistrate would be a proper subject for appellate review." Thomas v. Arn, 474 U.S. 140, 147-148, 106 S.Ct. 466, 88 L.Ed.2d 435. Our interpretation of Rule 72(b), requiring a party to specify those issues to which it objects but not the basis for the objections, provides a district court judge with notice as to which issues are being contested and therefore adequately deals with the sandbagging problem.
 
 
 34
 Of course, another policy concern justifies a requirement that a party specify the precise basis of each of the party's objections in its initial statement of objections. Such precision guides the district court judge in making his de novo review, directing the judge to precisely those lines of reasoning the party finds objectionable. Specifying the basis of a litigant's objections will also likely improve a litigant's chances of convincing a district court judge that the magistrate judge's analysis was in error. In some jurisdictions, local rules guide litigants in the filing of Rule 72(b) objections and require parties to specify the basis of their objections. See, e.g., Miller v. Currie, 50 F.3d 373, 380 (6th Cir.1995) (local rule required that objection identify the portions of the magistrate's recommendation to which objection is made and the basis for the objection); Sackall v. Heckler, 104 F.R.D. 401 (D.R.I.1984) (local rule provided that "party shall file with the clerk of the court and serve on all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objection"). In the absence of any implementing rules in the Northern District of Illinois, however, we are unwilling to interpret Rule 72(b) to impose such a requirement.
 
 
 35
 We hold therefore that Johnson did invoke the district court judge's obligation to conduct a de novo review by indicating which proposed findings or recommendations he found objectionable. For this same reason, Johnson's right to appellate review was not waived and we review the merits of his appeal.
 
 II.
 
 36
 We review the district court's grant of summary judgment de novo. Curran v. Kwon, 153 F.3d 481, 485 (7th Cir.1998). Lacking any direct proof of discriminatory motive or intent, Johnson chose to proceed under the familiar indirect method of proof first outlined in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. Under the McDonnell Douglas framework, a plaintiff bears the initial burden of producing evidence to sustain a prima facie case. If the plaintiff meets this burden, the employer must then produce evidence of a legitimate, nondiscriminatory reason for his action. If the employer offers a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. The ultimate burden of persuasion rests with the plaintiff to show impermissible motive or intent. See, e.g., Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 394 (7th Cir.1998). We analyze each of Johnson's claims in turn.
 
 
 37
 (a) Racial Discrimination Claim
 
 
 38
 Title VII provides that "[i]t shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case of racial discrimination under Title VII, a plaintiff must produce evidence that: (1) he was a member of a protected class; (2) he was qualified for the job in question or was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated persons not in the protected class more favorably. Taylor v. Canteen Corp., 69 F.3d 773, 779 (7th Cir.1995). Johnson is African-American and was fired from his job. The question on summary judgment is whether he was meeting Zema's legitimate performance expectations and whether other similarly situated persons who were not African-Americans were treated more favorably.
 
 
 39
 To show he was meeting Zema's legitimate expectations, Johnson relies on his 1993 and 1994 performance evaluations and the letter of recommendation company President Reyes prepared for Johnson after his termination in which he called Johnson "a serious and dedicated worker" who was "highly recommend[ed]."[2] Johnson also points to the pay raise and monetary bonuses he earned in 1993 and 1994.
 
 
 40
 Zema agrees that Johnson received strong yearly employment evaluations and a high recommendation from President Reyes when terminated, but contests whether Johnson was in fact meeting its legitimate expectations. In Johnson's 1993 performance review, Zema argues, Johnson was warned to spend more time with managers on the south side of Chicago. In April 1994, Vice President Doney admonished Johnson to divide his time more equally among the various sales managers and required Johnson to fill out weekly itinerary forms to improve his allocation of time among the sales managers. Taken together, Zema argues, this evidence shows Johnson failed to produce sufficient evidence that he was meeting his employer's legitimate expectations.
 
 
 41
 In contesting whether Johnson met Zema's legitimate expectations, we think Zema skips a few steps. Johnson bears a burden only of producing some evidence that he was meeting Zema's legitimate expectations. In coming forward with consistently positive employment evaluations and President Reyes' recommendation, Johnson has met his burden. Although Johnson's positive employment evaluations might be insufficient if they evidenced a pattern of declining performance, see Fortier v. Ameritech Mobile Communications Inc., 161 F.3d 1106, 1113 (7th Cir.1998), here no such pattern appears. Cf. Hong v. Children's Memorial Hosp., 993 F.2d 1257, 1262 (7th Cir.1993) (plaintiff's initial satisfactory performance declined to unacceptable level in year of termination). We find it significant that at the point of his termination, Zema continued to assert that Johnson was meeting, in fact exceeding, its expectations. From evidence of Zema's admonition, a reasonable jury might well conclude that Johnson had not met Zema's legitimate expectations. Putting the admonition in the context of Johnson's favorable evaluations, a reasonable jury could also conclude that despite this admonition Johnson continued to meet Zema's expectations. By introducing sufficient evidence that he met Zema's legitimate expectations, Johnson raised a genuine issue of material fact.
 
 
 42
 The fourth prong of Johnson's prima facie case required him to produce evidence that Zema treated similarly situated persons not in his protected class more favorably than he. Following Magistrate Judge Guzman's opinion, Zema argues that the fact that there was only one Vice President of Sales and Marketing precludes a finding that no similarly situated employee was treated more favorably than Johnson. We reject this contention. An employer cannot insulate itself from claims of racial discrimination simply by providing different job titles to each of its employees. Cf. Soto v. Adams Elevator Equipment, 941 F.2d 543, 548 (7th Cir.1991) (Under Equal Pay Act, "[a]ctual job performance and content, not job titles, are key."). The comparison of Johnson to similarly situated employees at Zema in this case thus requires us to compare Johnson's treatment with that of James Doney, Zema's Vice President and General Manager, the only person besides Johnson to occupy an intermediate managerial position.
 
 
 43
 In arguing that Johnson's performance was unsatisfactory, Zema relies on Reyes' admonition to Johnson to spend less time with Rich Rampich, one of the white sales managers. Johnson in turn cites this criticism, and the requirement that he fill out daily time sheets to monitor how he spent his time, as evidence of Zema's unfavorable treatment. The inference Johnson asks us to draw is that Doney and Reyes were uncomfortable with the thought of an African-American supervisor maintaining a close working relationship and friendship with a white salesperson. Doney, Johnson argues, faced no such racial restrictions on his working relationships and friendships.
 
 
 44
 Johnson presents evidence that Zema maintained a segregated sales force, that a climate of derogatory remarks prevailed at Zema, and that an African-American assumed that part of Johnson's duties involving supervision of African-Americans while a white assumed his duties of supervision over other whites. From the evidence presented, a reasonable jury could draw the conclusion that Johnson, an African-American, was expected to manage and befriend only African-American salespersons at Zema and that he was discharged because he failed to comply with these race-based limitations. Johnson therefore presents sufficient evidence that Doney was treated more favorably than he to sustain his prima facie case.
 
 
 45
 Johnson having established a prima facie case, Zema offers two legitimate, nondiscriminatory reasons for Johnson's discharge. First, Zema argues that Johnson failed to meet its legitimate expectations, offering evidence of Reyes' admonition to Johnson to divide his time more equally among salespersons. Second, Zema tenders Guerin's recommendation that Zema should "flatten out" its management structure by eliminating Johnson's position to argue that Johnson was fired to achieve cost savings at Zema.
 
 
 46
 Zema having offered sufficient evidence of a legitimate, nondiscriminatory explanation for Johnson's discharge, Johnson had the burden of coming forward with evidence that Zema's explanation was pretextual. To the contention that he failed to meet Zema's expectations, Johnson offers Doney's deposition testimony in which Doney stated that Johnson's performance was not the reason for his termination. In response to Zema's second reason, that Johnson's position was eliminated to achieve cost savings, Johnson points to the hiring of Collins, an African-American, two years after Johnson's firing, to assume Johnson's duties of supervision over African-American salespersons. After this hiring, Johnson argues, Zema's management structure was no flatter than before. If one couples this hiring with the fact that Doney assumed Johnson's duties of supervision over white salespersons, a reasonable jury could conclude that a desire to maintain racial segregation at Zema and not a desire to "flatten out" Zema's management structure motivated Reyes' and Doney's decision to fire Johnson. Johnson has therefore introduced sufficient evidence that Zema's proffered nondiscriminatory explanation for his firing was pretext for its racially based decision to fire him to sustain his burden on summary judgment.
 
 
 47
 In concluding otherwise, the magistrate judge relied in part on the "same-actor inference," which this Court has endorsed in both the ADEA and Title VII contexts. See Rand v. CF Indus., Inc., 42 F.3d 1139, 1147 (7th Cir.1994) (age discrimination); EEOC v. Our Lady of the Resurrection Med. Ctr., 77 F.3d 145, 152 (7th Cir.1996) (racial discrimination).[3] Under this theory, where the same person does the hiring and firing of an individual, an inference arises that the firing did not result from an improper discriminatory motive. The theory is based on a common-sense psychological assumption, that "[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." Proud, 945 F.2d at 797 (quoting Donohue & Seligman, The Changing Nature of Employment Discrimination Litigation, 43 Stan.L.Rev. 983, 1017 (1991)).
 
 
 48
 The psychological assumption underlying the same-actor inference may not hold true on the facts of the particular case. For example, a manager might hire a person of a certain race expecting them not to rise to a position in the company where daily contact with the manager would be necessary. Or an employer might hire an employee of a certain gender expecting that person to act, or dress, or talk in a way the employer deems acceptable for that gender and then fire that employee if she fails to comply with the employer's gender stereotypes. Similarly, if an employee were the first African-American hired, an employer might be unaware of his own stereotypical views of African-Americans at the time of hiring. If the employer subsequently discovers he does not wish to work with African-Americans and fires the newly hired employee for this reason, the employee would still have a claim of racial discrimination despite the same-actor inference.
 
 
 49
 It is for these reasons that the same-actor inference is unlikely to be dispositive in very many cases. In fact, we have found no case in this or any other Circuit in which a plaintiff relying on circumstantial evidence to prove an improper motive was able to produce sufficient evidence to otherwise sustain his burden on summary judgment and yet was foreclosed from the possibility of relief by the same-actor inference. This is unsurprising given that the same-actor inference is not itself evidence of nondiscrimination. It simply provides a convenient shorthand for cases in which a plaintiff is unable to present sufficient evidence of discrimination. See Rand, 42 F.3d at 1147, Our Lady of the Resurrection Med. Ctr., 77 F.3d at 152.
 
 
 50
 On the facts of this case, and without restating too much of what we have said above, Johnson is able to rebut whatever inference arises from the fact that the same person both hired and fired him. Johnson produces sufficient evidence of racial bias during his employment to suggest that when Reyes hired him, he expected Johnson to comply with the race-based limitations of the job. The evidence suggests that when Johnson failed to comply with these limitations, he was fired.
 
 
 51
 In recommending that Zema's summary judgment motion be granted, the magistrate judge also quoted the Fifth Circuit's opinion in Brown, 82 F.3d 651, for the proposition that "[t]he fact that the actor involved in both employment decisions is also a member of the protected class only enhances the inference" that racial discrimination did not motivate the decision to discharge. Id. at 657. The magistrate judge reasoned that Reyes, a Hispanic and 40 years old at the time of Johnson's termination, would be less likely to discriminate against Johnson, a 44-year-old African-American, because both belonged to two protected classes. In Brown, the Fifth Circuit did not establish a rule that forecloses establishing racial discrimination if both the boss who fires and the employee being fired belong to "protected classes," as the court in that case took pains to explain. Id. To do so would be absurd, because all people fit in at least one racial category and all races are protected from discrimination under the Constitution and federal employment discrimination law.
 
 
 52
 We doubt even the more limited proposition that a member of a certain race might be less inclined to discriminate against a member of his own race. Persons of a certain race might well harbor stereotypical views of other members of their own race and those stereotypical views might motivate decisions to discriminate. Whether a plaintiff can survive summary judgment on a discrimination claim depends on the evidence a plaintiff is able to present. We therefore doubt the utility of broad generalizations about who is and is not likely to discriminate in deciding whether a plaintiff has produced sufficient evidence of discrimination to sustain his burden on summary judgment.(b) ADEA Claim
 
 
 53
 To establish a prima facie case of age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., Johnson must show that (1) he was in the protected age group of 40 or older; (2) he was performing his job satisfactorily; (3) he was discharged; and (4) substantially younger employees were treated more favorably than he. Cianci v. Pettibone Corp., 152 F.3d 723, 728 (7th Cir.1998). With respect to the fourth prong, "an inference [of age discrimination] cannot be drawn from the replacement of one worker with another worker insignificantly younger." O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 313, 116 S.Ct. 1307, 134 L.Ed.2d 433. Rather, "a plaintiff must show that he was replaced by someone 'substantially younger,' although not necessarily outside the protected class." Richter v. Hook-SupeRx, Inc., 142 F.3d 1024, 1028 (7th Cir.1998).
 
 
 54
 Johnson was 44 years old at the time of his discharge. The evidence that Johnson performed according to Zema's expectations is the same as that which sustains the prima facie case on his Title VII claim and need not be belabored. The difficulty with Johnson's ADEA claim is the absence of any evidence that age was a motivating factor in Zema's decision to discharge. Unlike his claim of racial discrimination, Johnson cites almost no evidence that substantially younger employees were treated differently than he or that the legitimate, nondiscriminatory reason Zema gave for his discharge was a pretext for age discrimination. Johnson tells us that once Doney was heard to have said the company needed someone young to sell beer and on another occasion Zema moved one of the sales managers from one sales area to another because Doney considered that sales manager too old to work in his former sales areas. While the latter contention might support that sales manager's claim of age discrimination, what Johnson lacks, as contrasted with his race discrimination claim, is evidence upon which a reasonable jury could make the inferential leaps linking Johnson's discharge to allegedly wrongful conduct towards other employees at Zema. Summary judgment on Johnson's ADEA claim was proper.
 
 
 55
 (c) Retaliatory Discharge Claim
 
 
 56
 The retaliation provision of Title VII forbids an employer to "discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, an employee must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse action; and (3) there is a causal link between the protected expression and the adverse action. Eiland v. Trinity Hospital, 150 F.3d 747, 753 (7th Cir.1998).
 
 
 57
 Johnson's prima facie case on the retaliatory discharge claim founders on the absence of a causal link between his exercise of statutorily protected expression and his termination. The one specific instance Johnson cites in which he complained to Reyes and Doney occurred in 1991, some three years prior to his termination. Though this Court has held the causal nexus of the third step of the prima facie case to be sufficiently demonstrated when the time period between the complaint and the firing was a day or a week, McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 797 & nn. 5-6 (7th Cir.1997) (citing cases), in Eiland, 150 F.3d at 753 n. 2, we expressed concern that a month's gap between the exercise of protected speech and the alleged retaliatory action could alone support a prima facie case. In the absence of other evidence suggesting Johnson was fired for the exercise of his statutorily protected speech, a gap of three years between the protected speech and his firing is insufficient to sustain the third prong of his prima facie case of retaliatory discharge.
 
 
 58
 The grant of summary judgment on Johnson's ADEA and retaliatory discharge claims is AFFIRMED. On the claim of racial discrimination, the grant of summary judgment is REVERSED and REMANDED.
 
 
 
 [1]
 Johnson did cite as support for his objections the decisions of two other district court judges who had refused to grant summary judgment for Zema Systems in two other cases of alleged employment discrimination Johnson's attorney had brought on behalf of two other clients. Given that the question on summary judgment was whether Johnson had produced sufficient evidence to suggest his discharge by Zema was unlawful, it is hard to see how the fact that two other plaintiffs had produced sufficient evidence of an unlawful employment action helps Johnson's claim
 
 
 [2]
 Citing Reyes' own deposition testimony, Zema argues that the recommendation letter on which Johnson relies was in fact prepared by Johnson and was never signed by Reyes. On its face, however, the recommendation appears to be what Johnson asserts it to be. Summary judgment is an inappropriate vehicle to resolve conflicting testimony as to the authenticity of the recommendation letter
 
 
 [3]
 See also Williams v. Vitro Services Corp., 144 F.3d 1438, 1442-1443 (11th Cir.1998); Hartsel v. Keys, 87 F.3d 795, 804 n. 9; Brown v. CSC Logic, 82 F.3d 651, 657 (5th Cir.1996); Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 463 (6th Cir.1995); LeBlanc v. Great American Ins. Co., 6 F.3d 836, 847 (1st Cir.1993); Lowe v. J.B. Hunt Transport, Inc., 963 F.2d 173, 175 (8th Cir.1992); Proud v. Stone, 945 F.2d 796, 797-798 (4th Cir.1991)