Roland STALTER, Plaintiff–Appellant,

v.

WAL–MART STORES, INCORPORATED, Defendant–Appellee.

No. 98–3453.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1999.

Decided Sept. 30, 1999.

286

Mary E. Kennelly (argued), Madison, WI, for Plaintiff–Appellant.

William J. Holloway (argued), Hinshaw & Culbertson, Chicago, IL, for Defendant–Appellee.

Before RIPPLE, ROVNER and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Roland Stalter maintains he was fired by Wal–Mart because he is African–American. Wal–Mart counters that it fired him because he stole a handful of taco chips from another employee. The district court said that Stalter had no evidence that Wal–Mart's stated reason was pretextual, and granted summary judgment to Wal–Mart. We reverse and remand.

## I.

In October 1994, Wal–Mart hired Stalter to work as an Unloader in the Night Receiving Department in its Wausau, Wisconsin store. Stalter received a performance review in December of that year rating his work as "standard," which meant he was "consistent in performance, completes all assigned tasks, [and his] area runs smoothly and in order." Stalter had some difficulties with two Caucasian employees in the Receiving Department, Calla Sowinski and Becky Jo Ellenbecker. Stalter believed that Sowinski and Ellenbecker were treating him differently from other employees and were harassing him. Although he reported this conduct to his supervisor, John Pruss, Wal–Mart did not investigate his complaint.

Wal–Mart had an employee break room, which contained a countertop with a microwave, a refrigerator and a number of tables. Employees often left food in the break room, on the tables or the countertop, and would often share food, or eat food which appeared to be abandoned.[1] On occasion, a supervisor would order pizza for his or her department, and the pizza would be left in the break room for employees to eat as they wished. Some employees complained about food which had not been abandoned disappearing from the refrigerator in the break room, and Wal–Mart considered these possible thefts to be the source of a morale problem. In late January or early February 1995, Stalter ate a handful of taco chips from an open bag on the countertop in the break room. As he was munching, Ellenbecker and Sowinski entered the break room. The bag of chips apparently belonged to Ellenbecker, and she took the bag from Stalter and placed it in her locker. When Stalter realized the chips had not been abandoned but belonged to a particular individual, he apologized to Ellenbecker and offered to buy her a new bag of chips or a cup of coffee. Ellenbecker considered the incident "no big deal" and told Stalter to "forget about it."

Several days later, Stalter's supervisor, John Pruss, overheard Sowinski telling other employees that Stalter had eaten Ellenbecker's chips. Pruss asked Sowinski and Ellenbecker to provide written accounts of the incident, and they did so. In its entirety, Ellenbecker's statement reads as follows:

> Calla and I had punched out for a morning break and as we entered the breakroom we both saw Roland S. eating my chips. He had gotten his coffee and sat down so I took the bag of chips and put then in my locker, with him walking behind me, now knowing they were mine, yet did not say a word. The next night he came up to me and did apologize and offered to buy me another bag or coffee, but I said no, for him just to forget about it.

R. 30, Ex. C. Sowinski's statement is even more brief:

> I walked in to go on break, and when I came into the lounge—I saw Roland eating Becky Jo's Dorito's w/out anyone's permission. After we saw this—she went to get her chips, closed the bag and put them in her locker.

R. 30, Ex. E.

From this molehill of taco chips, Wal–Mart endeavored to make a mountain. Pruss took these statements to the store manager, and together they determined that Stalter committed theft, which was a form of "gross misconduct" under Wal–Mart's policies. An employee who committed gross misconduct was subject to immediate termination, according to Wal–

---

1. Wal–Mart claims that only food left on tables, as opposed to countertops, was considered abandoned by the employees (and apparently by the company). Placement on the countertop indicated a desire to retain ownership, and the employees knew this distinction, according to Wal–Mart. Stalter challenges this characterization, claiming any food left out in the room was considered fair game by everyone. On summary judgment, we give Stalter the benefit of the doubt.

Mart's view of its policy. Pruss also raised the incident with Wal–Mart's district manager, who agreed Stalter's act constituted theft and that termination was appropriate. On February 7, 1995, Pruss held a meeting with Stalter, during which Stalter admitted eating the chips. Pruss explained that this was theft and gross misconduct under Wal–Mart's policy and that Stalter was being terminated immediately.

Stalter first brought a state administrative action, and the ALJ in that proceeding found in Wal–Mart's favor. In that proceeding, Wal–Mart initially took the position that Ellenbecker complained about the incident to Wal–Mart management.[2] Wal–Mart later abandoned that position. Acknowledging that Ellenbecker did not care about the incident, Wal–Mart instead claimed that the viewpoint of the alleged victim of the theft was irrelevant. What was unknown at that time, and did not come to light until the discovery phase of the instant proceeding is that Ellenbecker had also committed "gross misconduct" under Wal–Mart's policy by not showing up for work at her scheduled time and lying to her supervisor about the reason for her absence. Instead of immediate termination, Ellenbecker was "counseled," a procedure in Wal–Mart's policy involving an employee meeting with management to discuss the incident and management indicating the need for improvement.

Stalter then sued in federal court, claiming his termination was race-based. The district court assumed for the purposes of Wal–Mart's summary judgment motion that Stalter met his burden of establishing a *prima facie* case of racial discrimination. Wal–Mart met its burden of articulating a

legitimate, non-discriminatory reason, according to the district court, by explaining that it terminated Stalter for theft, and not because of his race. This explanation shifted the burden back to Stalter to show that the reason stated was a pretext for race discrimination. Stalter argued to the district court that Wal–Mart's stated reason was pretextual, as evidenced by (1) Wal–Mart's failure to investigate his claim of racial harassment by Sowinski and Ellenbecker; (2) Wal–Mart's use of the theft provision in circumstances where it clearly should not apply; and (3) Wal–Mart's more favorable treatment of Ellenbecker, a Caucasian employee, who committed another form of gross misconduct near the time of the taco chip incident. The district court rejected each of these arguments, finding that there was no evidence that Stalter had informed Wal–Mart that Ellenbecker's and Sowinski's mistreatment of him was race-based, that Stalter did technically commit theft under Wal–Mart's policy, and that lying to a supervisor was readily distinguishable from and less serious than theft. The district court therefore granted summary judgment in favor of Wal–Mart.

## II.

On appeal, Stalter raises as evidence of pretext: (1) that Wal–Mart did not actually believe that Stalter engaged in theft; (2) that the punishment was grossly excessive in relation to the offense committed; (3) that Wal–Mart treated a Caucasian employee who had committed a similar offense much more leniently; and (4) that Wal–Mart failed to respond to Stalter's complaints of racial harassment by coworkers. Wal–Mart, in turn, contends

---

**2.** In a letter to the state's Equal Rights Division, Wal–Mart presented its defense to Stalter's charge of racism: "On February 07, 1995, an associate from the Night Receiving department went to a member of Management and complained about Charging Party [Stalter] taking her food. She stated that she witnessed him eating her chips that she had in her personal bag containing her lunch.

When Respondent [Wal–Mart] approached Charging Party to question him regarding the associate's complaint, Charging Party admitted to taking another associate's belongings without prior permission." Wal–Mart admitted at oral argument that this statement was untrue, and Wal–Mart has withdrawn from this position in the federal litigation.

that Stalter has not even made out a *prima facie* case of racial discrimination, much less shown that Wal–Mart's proffered reason for the termination was pretext.

■ Stalter seeks to prove his case under the *McDonnell Douglas* burden shifting method. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To make out a *prima facie* case under this framework, Stalter must show that he is a member of a protected class, that he suffered an adverse employment action, that he was meeting his employer's legitimate performance expectations, and that his employer treated similarly situated employees who were not in the protected class more favorably. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 742–43 (7th Cir.1999). To defeat summary judgment on the *prima facie* case, Stalter need only demonstrate that there is a genuine issue of material fact regarding these factors. No one disputes that Stalter, an African–American person, is in a protected class, and suffered an adverse employment action when he was terminated. Stalter raises a genuine issue of material fact on the remaining two prongs with evidence that he received a satisfactory performance review shortly before his firing, and with evidence that Wal–Mart counseled a Caucasian employee who committed a similar offense instead of terminating her. Wal–Mart makes much of the difference between theft and lying, but its policy for gross misconduct encompasses both, and Wal–Mart's dispute with Stalter's evidence cannot be resolved on summary judgment. Stalter therefore carries his burden on the *prima facie* case.

■ Under *McDonnell Douglas*, the burden then shifts back to Wal–Mart to state a legitimate, non-discriminatory reason for the firing. *Johnson*, 170 F.3d at 742. Wal–Mart claims that it fired Stalter not because of his race, but because he committed theft, and that company policy regarding gross misconduct such as theft, requires immediate dismissal. Stalter be-

lieves that Wal–Mart's argument fails at this point because part of meeting the legitimate, nondiscriminatory reason criteria is that the stated reason be credible. According to Stalter, Wal–Mart could not have believed that he committed theft based on the statement of the alleged victim, who did not care that her property had been taken. Stalter's argument really applies to the third part of the *McDonnell Douglas* test, whether the plaintiff can show that the employer's stated reason for the termination is a pretext for race discrimination. Certainly if Wal–Mart believed that Stalter committed theft, that would be a legitimate, non-discriminatory reason to fire him.

■ Under the *McDonnell Douglas* framework, the burden then shifts back to Stalter to show that Wal–Mart's reason is pretextual. *Johnson*, 170 F.3d at 742. Stalter may show pretext by producing evidence that Wal–Mart's ostensible justification is unworthy of credence. *See Testerman v. EDS Technical Products Corp.*, 98 F.3d 297, 303 (7th Cir.1996).

> [A] plaintiff may accomplish this showing with evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge. These formulations are simply different ways of recognizing that when the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation.

*Id.* (internal citations omitted). We look not at the wisdom of the employer's decision, but rather at the genuineness of the employer's motives. *Id.*, 98 F.3d at 304.

■ Stalter maintains that Wal–Mart could not have reasonably believed that he committed theft, especially in light of the statement of the alleged victim of the theft that he should "forget about it" and that she considered it "no big deal." He also

points out that the punishment of termination was grossly excessive in light of the alleged infraction of eating a handful of taco chips without permission, also casting doubt on Wal–Mart's true motive. Moreover, he asserts that Wal–Mart treated a similarly situated Caucasian employee who committed a similar offense much more leniently. Finally, he maintains that Wal–Mart's failure to investigate his claims of harassment by other employees indicates that Wal–Mart's true motive was race based. With the exception of this last bit of evidence, we believe that Stalter raises more than sufficient evidence to impugn the genuineness of Wal–Mart's motives. We discount the last fact, that Wal–Mart failed to investigate his claim of harassment, because Stalter conceded at oral argument that he never told Wal–Mart that the harassment was race-related. Wal–Mart's failure to investigate the claim cannot therefore be construed as race-related.

However, Stalter's other claims are more than adequate to call into question the sincerity of Wal–Mart's claim that it terminated him for theft. Wal–Mart's policy did not define theft, but any common understanding of the term would include a wrongful taking or a taking without permission, a definition Pruss, the decision-maker here, embraced at his deposition. R. 16, Ex. D, p. 36. Wal–Mart was well aware that the chips were left in an open bag on the countertop of the break room and that the owner of the chips did not object to their taking. Stalter produced evidence that food left in the break room in this fashion was considered abandoned and was fair game for anyone who wished to eat it. Wal–Mart claims that food left on tables was abandoned but that food left on the countertop was not considered abandoned by employees. This is a classic dispute of material fact, best left to the finder of fact to resolve, and on summary judgment, we construe the facts in Stalter's favor. Under Stalter's version of events, Wal–Mart knew that Stalter had Ellenbecker's implied permission to take the chips because of the placement of the open bag in the break room. Wal–Mart also knew that Ellenbecker did not actually object to Stalter's taking of the chips.

Wal–Mart claims it was sincere in its application of its theft policy, but we think this is much like the employer's claim in *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 275 (7th Cir.1996). There the employer claimed it terminated an older worker for falsifying records, when the company's code could not be reasonably read to support that interpretation. The employee had not falsified the record in question but had merely failed to notice that the record contained an unauthorized signature. We found that the company's insistence that the employee's action was identical to the actions of other employees terminated for falsification (employees who clearly met the definition) was "so perverse as to cast additional doubt on its good faith." 85 F.3d at 275. Here Wal–Mart claims that it terminated seven other employees, not in the protected group, for theft. Wal–Mart was unable to tell us at oral argument what these employees took, except to say that some of the terminations were for theft of time, i.e. conducting personal business on company time, and some for theft of property. These actions clearly fit within a reasonable understanding of the term "theft." Eating a handful of Doritos from an open bag on a countertop in the lunchroom is well outside of this domain, and a jury is certainly free to believe that this was not the true reason Wal–Mart fired Stalter.

More compelling is the severity of the punishment in relation to the alleged offense. It bears repeating that Stalter ate a handful of chips belonging to an employee who considered the incident "no big deal" and conveyed that sentiment to the company as well as to Stalter. This strikes us as swatting a fly with a sledge hammer. That Wal–Mart felt compelled to terminate Stalter for this offense does not pass the straight-face test, especially in light of two additional facts: first, Wal–

Mart did not terminate a Caucasian employee who also committed gross misconduct by failing to report to work as scheduled and then lying to her supervisor twice about the reason she was absent. Second, Wal–Mart claims that its policy was mandatory, that it was obliged to terminate an employee for any theft, no matter how slight the offense. This claim is belied both by the fact that Wal–Mart did not terminate the Caucasian employee for conduct that came under the very same provision of its policy, the gross misconduct provision, and by the fact that the provision is actually permissive. The policy reads:

> There are, however, certain actions of misconduct which **may** result in immediate termination—Coaching for Improvement will not be used to address gross misconduct. These actions include, but are not limited to, the following examples:
>
> Theft.
>
> . . . . .
>
> Dishonesty/Compromised Integrity.

R. 30, Ex. B, at 13 (emphasis added). Later in the policy, Wal–Mart states that "Dishonesty in any form will result in immediate termination." Thus, Wal–Mart's policy did not require termination for theft, and Stalter was terminated. The policy did require termination for dishonesty, yet the Caucasian employee was merely "counseled" and allowed to keep her job. A jury could certainly infer from these facts that Wal–Mart's claim of theft was a pretext for Stalter's termination, and that the leniency extended to the Caucasian worker was evidence that race played a role in Stalter's termination.

Stalter presents one more piece of persuasive evidence, and that is that Wal–Mart changed its story between the time of the state administrative proceeding and the federal action. At the state administrative proceeding, Wal–Mart claimed that Ellenbecker complained to the company about the taco chip incident. Wal–Mart later modified that story to admit that Ellenbecker never complained, but that under Wal–Mart's policy, the viewpoint of the alleged victim was irrelevant. Under our case law, this changed story is evidence of pretext, and entitles Stalter to a trial on the issue of the reason for his termination. *See Perfetti v. First Nat'l Bank of Chicago*, 950 F.2d 449, 456 (7th Cir.1991), *cert. denied*, 505 U.S. 1205, 112 S.Ct. 2995, 120 L.Ed.2d 871 (1992) (when employer gives one reason at the time of the adverse employment decision, and at trial gives another reason unsupported by the documentary evidence, the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification); *Emmel v. Coca–Cola Bottling Co. of Chicago*, 95 F.3d 627, 634 (7th Cir.1996) (failure to express non-discriminatory explanation earlier despite several opportunities to do so gives rise to inference that later expressed reason is pretextual). Wal–Mart's changed story about Ellenbecker's response to the incident could be construed by a jury as evidence of pretext.[3]

### III.

Stalter has raised genuine issues of material fact on a *prima facie* case of employment discrimination. Wal–Mart has offered a non-discriminatory explanation for the termination. Because Stalter has raised genuine issues of material fact re-

---

**3.** Wal–Mart also argues that because the same person hired and fired Stalter, it is entitled to a presumption that the firing was not race-based. However, we have stated that the "same-actor inference is unlikely to be dispositive in very many cases." *Johnson*, 170 F.3d at 745. We reasoned there that the same-actor inference might be unwarranted in certain fact scenarios. For example, we noted that "if an employee were the first African–American hired, an employer might be unaware of his own stereotypical views of African–Americans at the time of hiring." Stalter was one of two African–American employees in the Wausau Wal–Mart store, and the only one hired by Pruss. Thus, we give little weight to the same-actor inference in these circumstances.

garding whether that explanation is pretext for the true motivation for Stalter's termination, we reverse and remand for a trial on the disputed issues.

REVERSED AND REMANDED.