**Jeanette GILLIE–HARP, Plaintiff,**

v.

**CARDINAL HEALTH, INC. d/b/a
Cardinal Distribution,
Defendant.**

No. 02–C–136–C.

United States District Court,
W.D. Wisconsin.

Jan. 9, 2003.

Robert A. Pasch, Murphy & Desmond, SC, Madison, WI, for Cardinal health, Inc.

Michele R. Fisher, for Jeanette Gillie–Harp.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for injunctive and monetary relief. In plaintiff's amended complaint, she asserts three causes of action: (1) defendant violated the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), as amended 38 U.S.C. § 4311, when it terminated her because of her obligations as a reservist in the United States Air Force; (2) defendant violated 38 U.S.C. § 4316 when it required her to use her vacation time in order to perform her reserve duties; and (3) defendant violated the Fair Labor Standards Act, 29 U.S.C. § 201, when it made improper deductions from her wages. Jurisdiction is present for each claim under 28 U.S.C. § 1331.

Defendant has moved for summary judgment on each of plaintiff's claims. Plaintiff does not oppose defendant's motion with respect to her claims under 38 U.S.C. § 4316 (use of vacation time) and 29 U.S.C. § 201 (improper deductions), conceding by implication that the facts do not support those claims. Accordingly, I will grant defendant's motion with respect to those claims. However, I conclude that

a reasonable jury could find that plaintiff's military status was a motivating factor in defendant's decision to terminate plaintiff. In addition, I conclude that defendant has not established as a matter of law that it would have terminated plaintiff had it not been for her military status. Accordingly, I will deny defendant's motion for summary judgment with respect to plaintiff's claim under USERRA.

From the parties' proposed findings of fact, I find that the following facts are material and undisputed.

## UNDISPUTED FACTS

### A. *Defendant's Hiring of Plaintiff*

Defendant Cardinal Health, Inc., doing business as Cardinal Distribution in Wisconsin, is a wholesale distributor of pharmaceuticals to retail and hospital pharmacies and independent physicians. In May and June 2000, plaintiff Jeanette Gillie–Harp interviewed with defendant three times for a position as an inside sales consultant. Plaintiff had worked previously for one of defendant's competitors, McKesson, where she was responsible for servicing the Mayo Foundation hospitals. When defendant acquired the Mayo account from McKesson in 2000, Mayo suggested that defendant hire plaintiff to continue servicing the account.

Plaintiff interviewed first with Jeff Montgomery, a health systems sales manager for defendant, and Randy Phillips, a health systems sales director. Plaintiff interviewed next with Montgomery, Phillips and Doug Sparks, a director of operations. Plaintiff also interviewed with a customer service manager. Montgomery recommended to Phillips that plaintiff be hired and Phillips approved the recommendation. Plaintiff began her employment with defendant on July 17, 2000, as an inside sales consultant. Plaintiff's primary responsibility was to service the Mayo Foundation hospitals. Plaintiff's duties included resolving day-to-day delivery, product and general service issues, acting as liaison between Mayo and defendant's personnel for problem resolutions and "interfacing" with the field representatives. Plaintiff's immediate supervisor at Cardinal was Montgomery.

### B. *Defendant's Reaction to Plaintiff's Reserve Duties*

During at least one of her interviews, plaintiff told Montgomery that she belonged to the military reserves and that she was scheduled for military leave for two weeks in August 2000. Montgomery had never supervised an employee who was active in the military reserves and did not know what plaintiff's reserve duties would entail. When plaintiff told Montgomery that she would need to take off two weeks in August 2000 as part of her reserve obligations, Montgomery asked plaintiff if she could "get out of it." Plaintiff informed Montgomery that she could not reschedule her military leave.

Montgomery told Phillips that plaintiff needed time off for reserve duty in August 2000, though Montgomery did not generally discuss with Phillips other employees' requests for time off. Plaintiff took military leave for ten working days in August 2000.

In September or October 2000, plaintiff approached Montgomery and told him that she needed to take additional military leave in October. Montgomery asked plaintiff why she was taking off more time when she had just been gone for two weeks in August 2000. Plaintiff explained that the military's fiscal year ran from October to October rather than January to January so that her reserve duties began anew each October. Montgomery asked plaintiff why she was involved with the military. Montgomery ultimately granted her request to take three days of military leave.

On March 5, 2001, plaintiff wrote Montgomery in an e-mail that she had "annual mandatory 15 days" of reserve duty. Montgomery responded that he was "concerned with the amount of out of the office time and the impact on your job performance."

Plaintiff was required by her base to attend a military education program in April and May 2001. When plaintiff told Montgomery, he told her that she would have to attend on the weekends. Plaintiff explained to Montgomery that the classes were scheduled on the first week of the month from Wednesday to Saturday and could not be rescheduled. Plaintiff was allowed to attend the classes.

On at least one other occasion, Montgomery asked plaintiff whether her reserve obligation could be moved to a different time. In April or May 2001, Montgomery also told plaintiff once that she would have to use her vacation days to take military leave after she used up her paid leave days. Plaintiff informed Montgomery that requiring her to use vacation time was against the law.

In June 2001, plaintiff took an additional three days of military leave. Montgomery granted plaintiff's request for two days of military leave on June 26–27, 2001. Plaintiff went on military leave every time she asked to do so.

In August 2001, Montgomery wrote Phillips in an e-mail that he was "reluctant" to send plaintiff for training "due to the amount of time she is out of the office because of vacation and military leave." At company meetings, employee David Barclay heard Montgomery comment a couple of times on plaintiff's military leave. Montgomery would say that plaintiff was going to be "gone for another weekend, or out in the woods for another weekend." Barclay believed that Montgomery's comments were sarcastic.

Montgomery discussed with Phillips plaintiff's absences from work for her reserve duties.

On September 10 or 11, 2001, plaintiff informed Montgomery of her orders to report to Saudi Arabia in January 2002. Montgomery asked plaintiff how long she would be gone and she told him two to three weeks. He told her to bring him a written order from the military. He also told Phillips that plaintiff needed more time off to go to Saudi Arabia. After September 11, plaintiff discussed in her e-mails to others (which Montgomery was monitoring at the time) the possibility that the attacks in New York and Washington could mean she would be called into active duty.

C. *Issues Concerning the Mayo Account*

On June 3, 2000, plaintiff signed a document entitled "Certificate of Compliance with Company Policies." The document included an agreement not to take "any action intended to or that would disparage or diminish the reputation of the company."

Plaintiff's primary customer, Mayo, complained about the service they received when plaintiff was out of the office. Mayo believed that items were lost, that defendant's staff did not answer the phones, that defendant did not return Mayo's messages and that defendant had difficulty getting products to Mayo when plaintiff was away. Mayo's complaints were often accompanied by comments that plaintiff was the only person at Cardinal who followed through for Mayo. These complaints were discussed at conference meetings with representatives from Mayo, Montgomery and plaintiff. Montgomery also discussed with Phillips Mayo's service concerns, including the complaints about plaintiff's absence.

Mayo complained to plaintiff that when she worked at McKesson, she could call

another distribution center to ship the product directly to the customer, but could not do so at Cardinal. This caused a delay in getting the product. When Mayo complained, plaintiff agreed that she was frustrated as well. Plaintiff also told Mayo that there were things she could do them for them at McKesson that she could no longer do now that she was at Cardinal.

On March 26, 2001, Montgomery and Phillips conducted a "counseling session" with plaintiff. Plaintiff signed a "counseling form" setting forth the reasons for the session. The reasons included: (1) "[Plaintiff's] communications to the customer continue to imply that Cardinal Management, specifically Jeff Montgomery, her direct reporting manager, is inflexible in empowering [plaintiff] with the means and or the authority to perform her duties"; (2) "[Plaintiff] continues to express to [defendant] and Mayo the differences in how she performed in her previous position with McKesson and her new, different role with [defendant]"; (3) "On multiple occasions, Jeff Montgomery has met with [plaintiff] to review the issues stated above. However, negative feedback regarding this topic continues to filter back to Cardinal from customers." (Plaintiff disputes that Montgomery ever discussed theses issues with her before March 26, 2001.)

The form also contained expectations for the future, such as: (1) "As issues arise and are addressed, conversations with customers will be absent of any placement of blame towards any other [defendant] associate. [Plaintiff] will assume full responsibility for servicing her customers"; (2) "Should [plaintiff] encounter a situation where a[n] associate has prevented her from meeting the needs of any customer in a timely manner she is to communicate such to Jeff Montgomery, or the appropriate department manager, immediately"; and (3) "[Plaintiff] will represent [defendant] in a positive manner to all customers that she interfaces with on a day to day basis." In the employee comments section, plaintiff wrote, "I disagree with the reasons noted for counseling." After the counseling session was over, Montgomery or Phillips told plaintiff not to speak with anyone about the counseling session.

The counseling form required a follow-up session in 45 days to re-evaluate the situation. However, defendant never held another session because Mayo's perception of defendant improved.

At an April 2001 meeting between Mayo and defendant that plaintiff and Phillips attended, representatives from Mayo complained about some of the same policies that Phillips and Montgomery had reprimanded plaintiff for discussing. Phillips asked plaintiff how Mayo knew that plaintiff did not do the ordering and he told plaintiff to "make things transparent to them."

During a meeting, Montgomery reminded plaintiff and other staff that they should not inform customers of the quantity of certain products that defendant had in stock.

After the March meeting, Montgomery asked plaintiff to send copies to him of all of her e-mail communications with Mayo. Beginning in summer 2001, Montgomery also monitored plaintiff's e-mails directly without her knowledge. Montgomery saved plaintiff's e-mails in order to create a record that would support plaintiff's termination. Montgomery did not monitor any other employee this way.

On July 17, 2001, Montgomery conducted a performance evaluation with plaintiff. He does not recall discussing with plaintiff inappropriate comments that she made to customers. In a section for employer comments, Montgomery wrote: "Early in [plaintiff]'s first year there was concern

over feedback from the Mayo customers in terms of their negative perception of [defendant]. Counseling discussions to help [plaintiff] sell [defendant] to the Mayo customers have been successful." Montgomery gave plaintiff a score of 2.66 on a scale of 1 to 4, with 1 being the highest rating. He recommended that plaintiff receive a 2.75% raise.

On August 31, 2001, plaintiff sent the following e-mail to a customer at Mayo:

Hello, Deb, Pretty soon the whole building won't be talking to me. First Mary hasn't talked to me since last week, because I asked her to do the orders my way because that is the way yall like it, and to follow through, treat everything as urgent etc. Well now Terri, her friend, and Julie, aren't talking to me either, Terri in inventory today had the exception sheets since this morning, they are in inventory and I am supposed to give them the sheets to do DC transfers first, well I asked for them back, she said she hadn't had time to work on them and this was at 3:00. I said give them back to me and I will e-mail DC transfer requests to you. I copy her manager. Well if she would quit talking all day with the girls. And peoples comments around here, why can't Mayo use this instead, why that, dig, dig, dig. I won't cry, very immature people and not customer oriented. I have to talk to someone. Have a good weekend.

Montgomery read the e-mail and forwarded it to Phillips on September 6, 2001.

### D. *Plaintiff's Termination*

On October 3, 2001, defendant terminated plaintiff's employment. Montgomery and Phillips both attended the termination meeting. Phillips told plaintiff that defendant was terminating her because she continued to disparage defendant to Mayo, to harm defendant's relationship with Mayo and to disclose information with Mayo about defendant's internal policies and procedures.

Phillips had ultimate authority to terminate plaintiff. However, when making hiring and firing decisions, Phillips relies on the recommendations of sales managers such as Montgomery because Phillips does not work with the employees in Wisconsin on a day-to-day basis. Most of the information Phillips received about plaintiff's performance came from Montgomery.

## OPINION

■ The Uniformed Services Employment and Reemployment Rights Act prohibits employers from, among other things, discriminating against an employee on the basis of his or her noncareer obligation or performance in a uniformed service. 38 U.S.C. §§ 4301(a)(3) and 4311(a); *Miller v. City of Indianapolis*, 281 F.3d 648, 650 (7th Cir.2002). It is undisputed that plaintiff was a member of a uniformed service. An employer violates the act when the employee's military status is "a motivating factor in the employer's action" unless the employer proves that it would have taken the same action regardless of the employee's status. 38 U.S.C. § 4311(c). Thus, to prevail on her claim, plaintiff need not show that her military obligations were the *sole* reason that she was terminated. It is sufficient if she shows that defendant was motivated in part by an impermissible factor. *Leisek v. Brightwood Corporation*, 278 F.3d 895, 898 (9th Cir.2002) (noting that Congress amended the statute to replace the "sole cause" statute used previously by courts); *Robinson v. Morris Moore Chevrolet–Buick, Inc.*, 974 F.Supp. 571, 576 (E.D.Texas 1997); *cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (Title VII is violated when employer "relie[s] upon" or "take[s] [a protected characteristic] into account").

The first issue concerns the appropriate framework to analyze plaintiff's claim. Thus far, the Court of Appeals for the Seventh Circuit has issued few decisions interpreting and applying USERRA; in none of those decisions does it discuss issues relevant to this case. *See Miller,* 281 F.3d at 651–54 (holding that plaintiffs failed to establish disparate impact or harassment claim under USERRA and that plaintiffs' claims were barred by laches); *Pohl v. United Airlines, Inc.,* 213 F.3d 336 (7th Cir.2000) (holding that district court did not abuse its discretion in approving settlement agreement arising under USERRA); *Velasquez v. Frapwell,* 165 F.3d 593 (7th Cir.1999) (holding that federal courts do not have jurisdiction to hear USERRA claims against state); *McGuire v. United Parcel Service,* 152 F.3d 673 (7th Cir.1998) (holding that reservist was not entitled to reemployment because he failed to submit application).

In those few cases addressing the appropriate framework for claims under USERRA on summary judgment, courts have chosen not to apply the method articulated in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for proving a discrimination claim. *Gagnon v. Sprint Corp.,* 284 F.3d 839, 854 (8th Cir.2002); *Leisek,* 278 F.3d at 899 n. 2; *Sheehan v. Department of Navy,* 240 F.3d 1009, 1014 (Fed.Cir.2001). Rather, in *Sheehan,* the court cited legislative history suggesting that Congress wanted courts to apply the framework in *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Under that method, used in the context of the National Labor Relations Act, the plaintiff must show by a preponderance of the evidence that his or her protected status was a substantial or motivating factor in the adverse employment action. The burden of persuasion then shifts to the defendant to prove by a preponderance of the evidence that it would have made the same decision without regard to the plaintiff's protected status. In *Sheehan,* the court reasoned that *McDonnell Douglas* is inconsistent with the *Transportation Management* framework because in *McDonnell Douglas* only the burden of production shifts to the defendant while the burden of persuasion always remains with the plaintiff.

 Although I question the conclusion that the framework articulated in *McDonnell Douglas* never applies to claims of military discrimination, both parties in this case have proceeded under the framework articulated by the court in *Sheehan.* Because the Court of Appeals for the Seventh Circuit has held that a plaintiff may prove a discrimination claim either directly or indirectly, *see, e.g., Troupe v. May Department Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994) (describing four methods of proving a claim under Title VII), I will analyze plaintiff's claim using the framework suggested by the parties. Thus, the initial question is whether plaintiff has adduced sufficient evidence from which a reasonable jury could find that plaintiff's military status was a motivating factor in defendant's decision to terminate her. I conclude that she has.

### A. *Motivating Factor*

 As an initial matter, defendant argues that plaintiff cannot establish a discriminatory motive because the same decision makers both hired and fired plaintiff. Defendant notes correctly that in some discrimination cases, the court of appeals has held that an inference of nondiscrimination arises when the same decision maker hires and fires an employee. *See, e.g., Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 399 (7th Cir.1997). However, defendant is incorrect to the extent it suggests that the existence of a common decision maker prevents a plaintiff from

prevailing on a discrimination claim. The so-called "same-actor inference" is grounded in the psychological assumption that employers are unlikely to hire individuals from a group the employer dislikes and then fire them once they are on the job. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 745 (7th Cir.1999). A common actor "is not itself evidence of nondiscrimination." *Id.;* "[i]t is just something for the trier of fact to consider." *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 747 (7th Cir.2002). Moreover, as noted by the court in *Johnson*, "[t]he psychological assumption underlying the same-actor inference may not hold true on the facts of a particular case." In this case, plaintiff is not alleging that defendant "disliked" her because she was in the reserves. Indeed, employers are more likely to view a candidate's veteran status as an asset rather than a liability. However, there is a difference between holding members of the armed services in high esteem and being eager to accommodate a reservist's absences from work. If an employer is unaware of when and how often an applicant will be away on reserve duty, then it is unlikely to take into account the applicant's military status at the time of hiring. Rather, it is more likely to develop hostility towards an employee's reserve duties after experiencing the inconvenience that those duties can cause to the business. Thus, the application of the same actor inference is questionable in a case involving a claim of military discrimination.

█ Even assuming, however, that defendant is entitled to an inference of non-discrimination, I conclude that plaintiff has adduced sufficient evidence to overcome it. It is undisputed that customers from Mayo complained to Montgomery and Phillips about plaintiff's absences. Furthermore, it is undisputed that Montgomery expressed frustration over plaintiff's military leave several times. When plaintiff first told Montgomery that she would need to

take time off in August 2000, Montgomery asked her if she could "get out of it." Each time plaintiff requested to take military leave, Montgomery questioned her. Montgomery asked plaintiff at least once to move her obligation to a different time. He told her that she would have to use vacation days to take leave, which the law did not require her to do, and another time he told her that she would have to fulfill her reserve duties on the weekends. In addition, it is undisputed that Montgomery wrote several e-mails to plaintiff and others expressing concern over the amount of time plaintiff was out of the office because of military leave. At least one co-worker, David Barclay, heard Montgomery making sarcastic comments at company meetings about plaintiff's reserve duties. (I agree with defendant that the statements allegedly made by Montgomery and overheard by Betty Aschenbrener are inadmissible. Plaintiff's proposed fact for these statements relies only on Aschenbrener's affidavit. However, the affidavit contains no statement by the affiant that under penalty of perjury the information in the affidavit is true, as required by 28 U.S.C. § 1746. Therefore, I cannot consider Aschenbrener's affidavit.) Finally, it is undisputed that after the events of September 11, 2001, plaintiff discussed in e-mails the possibility that she would be called for active duty and that Montgomery was monitoring the e-mails. Defendant terminated plaintiff on October 3, 2001.

In addition to these undisputed facts, there is a genuine dispute whether Montgomery told plaintiff that she could not take military leave because "things fall apart when you're gone," asked plaintiff why she did not get out of the military, yelled at her whenever she asked for time off for reserve duty and told plaintiff after the events of September 11, 2001, "I suppose you're going to try to tell me you have to go somewhere for a longer period

of time now." It is also disputed *when* defendant made the decision to terminate plaintiff. Phillips testified that it was just *before* September 11, while Montgomery testified that the final decision was not made until the third week of September.

Defendant presents several arguments why Montgomery's statements are not evidence of discrimination. First, defendant contends that Montgomery's statements cannot be viewed suspiciously because plaintiff was never actually denied a request to take military leave and argues that all of Montgomery's statements were either meant jokingly or were based on a misunderstanding of the law. However, the issue in this case is not whether defendant violated the law by denying plaintiff leave; the issue is whether plaintiff's military status was a motivating factor in defendant's decision to terminate plaintiff. Although Montgomery ultimately granted plaintiff's leave requests, there is evidence suggesting that he did so grudgingly. Montgomery's statements could be interpreted reasonably as showing hostility to plaintiff's military absences and thus support an inference that plaintiff's military status was a motivating factor in the decision to terminate plaintiff. It will be for the jury to decide whether Montgomery's statements were mere jokes or based on misunderstandings.

Defendant contends next that Montgomery's comments do not support an inference of discrimination because they do not relate to and are not contemporaneous with the decision to terminate plaintiff. *See Cianci v. Pettibone Corp.,* 152 F.3d 723, 727–28 (7th Cir.1998). It is true that Montgomery never told plaintiff, "You're being fired because you take too much military leave." Therefore, plaintiff does not have direct evidence of discrimination as she contends she does. The statements on their own are not sufficient *as a matter of law* to shift the burden of persuasion to

defendant. *See Stone v. City of Indianapolis Public Utilities Division,* 281 F.3d 640, 644 (7th Cir.2002) (defining "direct evidence" as "evidence that establishes [discriminatory intent] without resort to inferences from circumstantial evidence"). This does not mean, however, that Montgomery's more "ambiguous statements" cannot be evidence of discrimination. *See Troupe,* 20 F.3d at 736. Statements that do not constitute *direct* evidence of discrimination can nevertheless be probative of discriminatory intent. *Hoffman v. MCA, Inc.,* 144 F.3d 1117, 1124 (7th Cir. 1998).

Although Montgomery did not make any statements to plaintiff regarding her military leave on the day she was fired, defendant cites no authority interpreting the meaning of "contemporaneous" so strictly. There is evidence that Montgomery made hostile remarks about plaintiff's reserve duties each time she requested time off and throughout her employment with defendant, the last of which was just after the events of September 11, 2001, and only three weeks before her termination date. This evidence is sufficient to support an inference of discrimination under USER-RA. *See Leisek,* 278 F.3d at 900 (evidence that defendant told plaintiff that he would have to deduct military leave from his vacation time and would not have future leave orders honored supported inference of discrimination); *Satterfield v. Borough of Schuylkill,* 12 F.Supp.2d 423, 439 (E.D.Pa.1998) (reasonable jury could infer discrimination from witness testimony that defendant was not happy with plaintiff's military status, made derogatory comments about his reserve duties and complained that his paid leave was excessive).

Finally, defendant argues that even if Montgomery's comments support an inference that *Montgomery* harbored discriminatory animus against plaintiff, there is no

evidence that *Phillips* made any discriminatory remarks. Because Phillips made the decision to terminate plaintiff, defendant contends, Montgomery's comments cannot be used to show discriminatory intent on behalf of defendant. Although defendant is correct that statements made by those uninvolved in the employment decision are not relevant to prove discrimination, *see Biolchini v. General Electric Co.,* 167 F.3d 1151, 1154 (7th Cir.1999), it is undisputed that Montgomery *was* involved in both the decision to hire and fire plaintiff. Phillips relied on the recommendations of Montgomery because Phillips did not have much contact with plaintiff. Furthermore, Phillips received most of his information about plaintiff from Montgomery, who told Phillips about plaintiff's requests for military leave. "[I]f a plaintiff can show that the attitudes of the person who made the remarks tainted the decision maker's judgment, the remarks can be relevant to prove discrimination." *Hoffman* 144 F.3d 1117, 1122 (7th Cir. 1998); *see also Russell v. Board of Trustees of University of Illinois,* 243 F.3d 336, 342 (7th Cir.2001) (supervisor's discriminatory comments were relevant when supervisor participated in committee decision to discipline plaintiff). Defendant alleges that Montgomery did not want to fire plaintiff and that Phillips made the decision against Montgomery's wishes. However, there is no documentation or testimony to support this assertion, only self-serving affidavits of Phillips and Montgomery. Further, it is undisputed that Montgomery was saving plaintiff's e-mails to create a record for her termination. Viewing the evidence in the light most favorable to plaintiff, as I must, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), I conclude that a reasonable jury could find that plaintiff's military status was a motivating factor in defendant's decision to terminate her.

### B. *Evidence of Nondiscrimination*

Defendant contends alternatively that even if plaintiff has sufficient evidence to support an inference that discrimination was a motivating factor in the decision, it can prove that it would have terminated plaintiff regardless of her military status. *See* 38 U.S.C. § 4311(c)(1). Defendant asserts that the real reason plaintiff was terminated was "poor performance," specifically that plaintiff continually made negative comments about Montgomery and the company to customers and divulged the company's internal procedures without authorization.

Although plaintiff disputes most of the allegations regarding her conduct, defendant is correct that its belief does not have to be accurate, only honest. *Helland v. South Bend Community School Corp.,* 93 F.3d 327, 330 (7th Cir.1996). However, because I have already concluded that a reasonable jury could find that defendant's decision was influenced by discriminatory factors, to prevail on summary judgment *defendant* must show *as a matter of law* that plaintiff's performance alone would have led to her termination. I conclude that defendant has not met this burden.

First, I note the conclusory nature of much of the evidence defendant relies on to show that it believed plaintiff was making negative comments. Defendant's proposed findings of fact contain a plethora of allegations that Phillips and Montgomery heard complaints from "Cardinal employees" and "representatives from Mayo" that plaintiff made disparaging comments to Mayo about defendant and its employees. *See, e.g.,* Dft.'s Prop. Find. of Fact, dkt. # 28, ¶¶ 37, 38, 42, 47, 48, 65, 66, 85. Defendant does not identify who these employees or representatives are and cites only the affidavits of Phillips and Montgomery to support its allegations, making it impossible for plaintiff to contradict

them. Affidavits must contain "specific facts" to be admissible under Fed. R. Civ. P 56(e). *See Drake v. Minnesota Mining & Manufacturing Co.,* 134 F.3d 878, 887 (7th Cir.1998). ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") Accordingly, I have not considered defendant's proposed findings of fact that do not identify the source of the complaints.

In those proposed findings that *do* identify a specific employee that heard a comment from plaintiff, there is no corresponding allegation that the employee ever told Phillips or Montgomery about plaintiff's comments. As noted above, the issue is not whether plaintiff *actually* made negative remarks about defendant, but whether defendant honestly *believed* she did. If the employees that allegedly overheard plaintiff's comments never passed the information on to Phillips or Montgomery, then what they heard is not relevant for the purpose of summary judgment. Although evidence acquired after an employee was fired may act to limit a plaintiff's remedies, generally it cannot be used in discrimination cases to prove the absence of discrimination. *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

The undisputed facts that remain are: (1) Phillips and Montgomery had one meeting in March 2001 with plaintiff in which they accused her of making negative comments and told her to refrain from similar behavior in the future; (2) in an April 2001 meeting between Mayo and defendant, representatives from Mayo complained about policies they should not have known about; (3) plaintiff wrote an e-mail on August 31, 2001, that both Montgomery and Phillips read, in which plaintiff complained to a customer at Mayo about her co-workers.

Although these facts support an inference that defendant terminated plaintiff for making inappropriate comments, I cannot conclude that no reasonable jury could reject defendant's explanation. First, there is evidence that plaintiff's comments were not a substantial concern of defendant. Although the counseling form from March 2001 indicates that plaintiff would have a follow-up meeting with Phillips and Montgomery in 45 days to reevaluate plaintiff's conduct, it is undisputed that no meeting occurred. Furthermore, when plaintiff was evaluated by Montgomery in July 2001, he wrote that, "Counseling discussions to help [plaintiff] sell [defendant] to the Mayo customers have been successful." Although it is true that plaintiff's e-mail was written after the evaluation, it would be surprising that one e-mail by itself would trigger a termination decision. Furthermore, even if I considered all of defendant's proposed findings of fact regarding the complaints that it heard, I still could not grant defendant's motion for summary judgment. When a defendant has the burden of persuasion to show non-discrimination, the "persuasiveness of that showing will normally be for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir.1997). I cannot conclude that a reasonable jury would be compelled to accept defendant's version.

Defendant has advanced no other reasons for terminating plaintiff. Accordingly, defendant's motion for summary judgment will be denied with respect to plaintiff's USERRA claim.

ORDER

IT IS ORDERED that

1. The motion for summary judgment of defendant Cardinal Health, Inc. d/b/a/ Cardinal Distribution is GRANTED with respect to plaintiff Jeanette Gillie–Harp's claims that defendant required plaintiff to use her vacation to take military leave in violation of 38 U.S.C. § 4316 and made improper deductions from her wages in violation of 29 U.S.C. § 201. Those claims are DISMISSED from this case.

2. Defendant's motion is DENIED with respect to plaintiff's claim that defendant terminated her employment in violation the Uniformed Services Employment and Reemployment Act of 1994.