18-2441-cv
*Bentley v. AutoZoners, LLC, et al.*

In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2018

No. 18-2441-cv

RACHEL BENTLEY,
*Plaintiff-Appellant*,

v.

AUTOZONERS, LLC, AUTOZONE NORTHEAST, LLC,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Connecticut

SUBMITTED: JUNE 17, 2019
DECIDED: AUGUST 19, 2019

Before: WINTER, CABRANES, and RAGGI, *Circuit Judges*.

————————————

On appeal from a judgment entered in this diversity action in the United States District Court for the District of Connecticut (Squatrito, J.), plaintiff challenges an award of summary judgment to defendants on her state law claims of sex discrimination, retaliation, and hostile work environment. Plaintiff argues that she adduced sufficient evidence to permit a factfinder to conclude that (1) defendants' proffered reason for her discharge—plaintiff's use of crude language toward a co-worker (also discharged) who disparaged women—was a pretext for sex discrimination and retaliation; (2) the offending co-worker was a supervisor, making defendants strictly vicariously liable for his creation of a hostile work environment; and (3) even if the offending co-worker was not a supervisor, defendants had notice of his misconduct, so as to be liable for negligently failing to remedy the hostile environment. Plaintiff particularly faults the district court for holding that parts of her deposition testimony could not raise genuine issues of material fact as to notice because of perceived contradictions with her earlier written and sworn statements.

AFFIRMED.

————————————

JAMES V. SABATINI, ESQ., Sabatini & Associates, LLC, Newington, Connecticut, *for Plaintiff-Appellant*.

MICHAEL P. DEVLIN, ESQ., Berchem, Moses & Devlin, P.C., Milford, Connecticut;

2

TRACEY E. KERN, ESQ., Jones Walker, LLP, New Orleans, Louisiana; LAURIE MICHELE RILEY, ESQ., Jones Walker, LLP, Miami, Florida, *for Defendants-Appellees.*

REENA RAGGI, *Circuit Judge*:

In this diversity action, plaintiff Rachel Bentley sues her former employer AutoZoners, LLC, and related company AutoZone Northeast LLC, for sex discrimination, retaliation, and a sex hostile work environment in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60. She now appeals from an award of summary judgment entered on July 18, 2018, in the United States District Court for the District of Connecticut (Dominic J. Squatrito, *Judge*) in favor of defendant AutoZoners, LLC ("AutoZone"). *See Bentley v. AutoZoners, LLC*, No. 16-cv-1506 (DJS), slip op. (D. Conn. July 18, 2018).[1] Bentley argues that she adduced sufficient evidence to raise triable issues of fact on the following questions: (1) whether AutoZone's proffered reason for her discharge—her use of crude language toward a co-worker who disparaged women (and who was also discharged)—was a pretext for sex discrimination and retaliation; (2) whether the offending co-worker was a "supervisor," making AutoZone strictly vicariously

---

[1] The district court dismissed claims against co-defendant AutoZone Northeast, LLC, as abandoned. *See Bentley v. AutoZoners, LLC*, slip op. at 1. As Bentley does not challenge that ruling on this appeal, we have no reason to consider it further.

3

liable for the hostile work environment he created; and (3) whether, even if the offending co-worker was not a supervisor, AutoZone had sufficient notice of his misconduct as to be liable for negligently failing to end the hostile environment. Insofar as the district court concluded that she did not adduce sufficient evidence to defeat summary judgment, Bentley particularly faults its holding that parts of her deposition testimony could not raise genuine issues of material fact in light of contradictions and inconsistencies with her earlier signed or sworn statements. For reasons explained herein, we conclude that Bentley's arguments fail on the merits. Accordingly, we affirm the challenged judgment.

## BACKGROUND

## I.     Bentley's Employment and Termination

From April 13, 2013, until her discharge on September 17, 2014, plaintiff Rachel Bentley worked for defendant AutoZone as a part-time sales associate in its Wallingford, Connecticut store. For the first 14 months Bentley worked at the store, the store manager position was unfilled. Personnel problems plagued the store, with three parts sales managers (two male, one female) and Bentley all fired within a two-year period for professional misconduct.

### A. AutoZone Employment Policies

Bentley acknowledges that, at the start of her employment with AutoZone, she received and read an employee handbook detailing various policies, including one, pertinent here, which expressly prohibits workplace discrimination and harassment based on sex. The

4

handbook further instructs employees promptly to report any such misconduct to a supervisor or a member of the human resources department ("HR"), either directly or by means of a toll-free hotline. The handbook also states that abusive language in the workplace is prohibited and that such misconduct can result in termination. Bentley acknowledges awareness of these policies at times relevant to this action.

She also admits awareness of AutoZone's attendance requirements and its use of a point-system and progressive discipline to address attendance issues, with employees accumulating 12 or more points subject to termination.[2]

## B. Management of the Wallingford Store

Although AutoZone stores usually have on-site store managers, that position was unfilled at the Wallingford location for much of the time Bentley worked there.[3] Thus, district manager David Campanile—responsible for overseeing eleven stores—would visit the Wallingford store from time to time to check on its operations and arranged for East Haven store manager Arif Mohamed to visit Wallingford approximately once a week for a few hours. Otherwise,

---

[2] As the district court recognized, and our own review of the record confirms, there is no evidence that AutoZone employed this point-system or progressive discipline for workplace misconduct other than attendance. *See Bentley v. AutoZoners, LLC,* slip op. at 18.

[3] Only in June 2014—more than a year after Bentley started working at the Wallingford store—was Jonathan Granoff hired as store manager for that location.

Campanile relied on a store "management team," consisting of two parts sales managers ("PSM"), for the day-to-day running of the store. For the first few months of Bentley's employment, the Wallingford PSMs were Justine Case and Stuart Mertel. After Mertel was fired sometime in late 2013 for inappropriate conduct not specified in the record, Manny Valentin became the second PSM at the Wallingford store on January 28, 2014. Valentin's interactions with Bentley are the basis for her sex discrimination and hostile work environment claims.

AutoZone PSMs wore gray uniform shirts, signifying management. They were responsible for opening and closing stores, giving employees daily work assignments, and imposing informal discipline as warranted. Formal discipline, however, appears to have required higher management.[4] PSMs were also not empowered to hire, fire, promote, or demote employees. Indeed, termination could not be ordered by a store manager, or even a district manager; it required the action of a regional manager. Nor could PSMs set employee work schedules. That task was usually performed by a store manager but, for the time in 2013-14 when that position was unfilled at Wallingford, that store's employees' work schedules were set by East Haven store manager Mohamed.

---

[4] Indeed, none of the "written warnings" or "serious violation" notices that Bentley received for attendance issues—discussed in the next point of this Background section—were issued by a PSM. Rather, they were submitted by a store manager and approved by an HR officer.

6

### C. Bentley's Attendance Record

Almost from the start of Bentley's employment with AutoZone, she had attendance problems. The record indicates that in 2013, *i.e.*, before Valentin was employed at the Wallingford store, Bentley was late for work on May 18, absent from work on June 29, late on September 3, absent on September 7, absent on September 24, absent on October 1, and late on December 4. The October absence prompted a formal "written warning," advising Bentley that she had accumulated 9.5 points, and, that if her attendance performance did not improve, she faced further corrective action, including termination. The December tardiness prompted a "serious violation" notice.

Bentley's attendance problems persisted into 2014, such that by March 7, 2014, she had accumulated 13 points, enough to warrant her termination under company policy. AutoZone, however, did not terminate her. Rather, Mohamed submitted, and HR manager Nuno Antunes approved, another serious violation notice, which Campanile discussed with Bentley at a meeting on March 12, 2014. Subsequent attendance concerns were similarly addressed through discipline short of termination.

### D. Bentley Clashes with Valentin

During her employment, Bentley clashed with various co-workers. She testified that, after about a month on the job, PSM Case (who had served as a reference for Bentley on her employment application with AutoZone) told Bentley she was "not going to last

7

long" on the job and was "a bad employee." App'x 91. In December 2013, when Antunes was investigating another employee's complaint about PSM Mertel (which resulted in Mertel's termination), Bentley told Antunes that Mertel had "gotten into [her] face," telling her she "didn't know what [she was] doing." *Id.* at 111. It is only her subsequent interactions with Valentin, however, that Bentley claims were informed by sex-based animus.

In her sworn deposition testimony, Bentley stated that, within a week of Valentin starting at the Wallingford store in January 2014, and on more than 20 occasions thereafter, he made vulgar and disparaging comments about women's job performance, calling them "lazy," and suggesting that they should be home "bak[ing] cookies." *Id*. at 93–94. In moving for summary judgment, AutoZone does not dispute that Valentin made such remarks. Rather, it disputes having notice of the misconduct before August 2014.

Bentley, however, testified at her deposition that she contemporaneously reported each occasion when Valentin made sexist remarks to HR manager Antunes. Indeed, she recounted reporting Valentin's very first sexist remark to Antunes on the January day that it was made, sending Antunes a text message from the Wallingford sales floor, which contained "the exact comment." *Id*. at 94. She testified to sending Antunes similar text messages in February and March reporting Valentin's further sexist comments, as well as making such reports by telephone. Bentley had no record of these text messages or calls, explaining that she had disposed of the cell phone used to send them soon after her termination. When

8

confronted with a record of her text messages to Antunes as retrieved from his phone—none of which complained of sexist comments by Valentin—Bentley retracted her earlier testimony about giving notice by text. She maintained, however, that she called Antunes to report Valentin's misconduct, but to no effect.

The single text message in the record showing Bentley complaining to Antunes about Valentin is dated May 21, 2014. It states, "Nuno I'm about to quit this job [M]anny [Valentin] is being so ridiculous and making up lies and trying to make me go home. And he threatened to slap me." *Id*. at 239. Bentley now asserts that, in connection with this incident, Valentin was "saying some really sexist things, but I just didn't say it" in the text. *Id*. at 105. That same day, she complained orally to District Manager Campanile about Valentin. Campanile's contemporaneous email to Antunes, copied to regional manager Charles Blank, states: "I have an incident" at the Wallingford store. Bentley says PSM Valentin "was verbally harras[s]ing her and said he was going to slap her because she doesn't do her job." *Id*. at 295.

In response to the complaint, Antunes spoke in person with both Bentley and Valentin, the former on May 23, 2014, the latter on May 27. Antunes recalls Bentley telling him the incident arose when she failed to act on Valentin's request that she get some parts for him, a failure she attributed to her being busy with a customer. Bentley does not challenge this account in her own testimony. Nor does she claim to have told Antunes in the interview that Valentin had been making sexist comments at the time of the incident. For his part,

9

Valentin admitted to Antunes that he threatened to send Bentley home and to report her to Campanile for insubordination, but denied saying he would slap her. Apparently, AutoZone took no further action on the matter.

The circumstances leading to Bentley's—and Valentin's—termination originated with district manager Campanile reporting to Antunes on July 25, 2014, that PSM Case had advised of discord between Bentley and Valentin. On August 5, 2014, Antunes contacted Case. She told him that Valentin frequently disparaged women and called Bentley lazy.

On August 14, 2014, Antunes spoke with Bentley, who agreed to provide a signed written statement. In that statement, which is in a question and answer format, Bentley asserted that Valentin frequently disparaged women (quoting him saying "never work with a female, females are lazy, they don't do anything"); called Bentley and PSM Case "lazy"; asserted that "[g]uys are superior to women"; and stated "that he doesn't want to work with women." *Id*. at 126. Bentley said that Valentin had made such comments to male customers "[a]bout 20 times," and to Case and Bentley about "15 times," most recently "[l]ast month." *Id.* at 126–27. Bentley also identified two male employees who had heard Valentin make such remarks. Asked if she had reported Valentin's comments, Bentley answered, "No." *Id.* She further stated that Valentin had threatened to cut her hours on two occasions and to fire her on six occasions, most recently, the previous Monday. Bentley said she reported the last firing threat to "John," the store manager—presumably, a reference

10

to Jonathan Granoff. *Id.* at 128–29. In her August 14 statement, Bentley also accused PSM Case of misconduct, specifically, watching Netflix on company time, eating snack merchandise sold at the store without paying for it, and putting store phones on hold after the store manager left for the evening so that she would not have to answer calls.

After speaking with Bentley on August 14, Antunes instructed Campanile that, pending further investigation, Bentley and Valentin should not be scheduled to work at the same time. Antunes then proceeded to interview the two male employees identified by Bentley, both of whom denied ever hearing Valentin make derogatory comments about women.

Antunes then re-interviewed PSM Case. In a written statement dated August 20, 2014, Case reiterated hearing Valentin make derogatory remarks about women workers on several occasions; tell Bentley she was lazy; and threaten to cut Bentley's hours, fire her, and slap her. Case further admitted that over the past three months she had routinely consumed AutoZone snack merchandise without paying for it. She also admitted that for the past four months she had frequently put store phones on hold after the store manager left. She knew this was wrong but she felt "overwhelmed" and "didn't want to deal with customers at the time." *Id*. at 275.

Antunes next interviewed Valentin who, in a signed, written statement dated September 2, 2014, denied ever making any negative remarks about women generally or women work colleagues in particular. He further denied ever threatening to slap any co-worker,

11

to cut a worker's hours, or to terminate a worker. What he did report was a particularly crude remark that Bentley had purportedly directed at him a few months earlier on the trading floor, *i.e.*, "Manny you need to get your d--k sucked." *Id*. at 264. Valentin stated that he did not report this conduct to anyone, but he claimed that Case and another employee had witnessed it.

Antunes proceeded to re-interview Bentley. In a second signed statement, this one dated September 10, 2014, Bentley admitted making the crude statement attributed to her by Valentin sometime in February 2014.[5] She adhered to her earlier statement that Valentin threatened to slap her in March 2014.

Upon concluding his investigation, Antunes recommended to regional manager Blank that Valentin, Bentley, and Case all be fired, Bentley and Valentin for inappropriate conduct, and Case for unauthorized consumption of company merchandise. Blank adopted the recommendation and ordered all three employees' termination. Campanile carried out the order.

## II.    Procedural History

On February 19, 2015, Bentley filed a claim with the Connecticut Commission on Human Rights, complaining that she was wrongfully discharged based on sex and in retaliation for reporting sex discrimination and that, while employed, she had been subjected to a sex hostile work environment, all in violation of the

---

[5] Bentley now dates the vulgarity to April 2014.

12

CFEPA, Conn. Gen. Stat. § 46a-60. Upon that agency's release of jurisdiction, Bentley commenced this CFEPA action in state court, which defendants removed to federal court based on diversity jurisdiction.

Following discovery, AutoZone moved for summary judgment, which the district court granted, concluding that Bentley failed to adduce evidence sufficient to raise triable issues of fact on any of her three claims. In so ruling, the district court determined that the part of Bentley's deposition testimony insisting that she had complained before August 2014 of Valentin's sexist comments could not raise genuine issues of fact because it was so unequivocally contradicted by earlier written and sworn statements that no reasonable person could believe it.

This timely appeal followed.

## DISCUSSION

### I.     The Decision To Disregard Parts of Bentley's Deposition Testimony

We review an award of summary judgment *de novo*, and will affirm only if the evidence, viewed "in the light most favorable to the non-moving party"—here Bentley—shows "no genuine dispute as to any material fact" and entitles movant—here AutoZone—to judgment "as a matter of law." *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (internal quotation marks and citations omitted); *see Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir. 2006). To conduct such review, we must decide what evidence can be

13

considered. Bentley argues that the district court erred in ruling that part of her deposition testimony—professing to have reported Valentin's sexist comments to AutoZone before August 14, 2014—could not be considered in identifying colorable issues of fact because it was so contradicted by Bentley's own written or sworn accounts. We identify no error.

The district court's opinion shows its thorough familiarity with the relevant principles of law, which guide our own *de novo* review. Those principles instruct that courts reviewing summary judgment motions "generally should not weigh evidence or assess the credibility of witnesses." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Nevertheless, "in the rare circumstance where the plaintiff relies almost exclusively on [her] own testimony, much of which is contradictory and incomplete," to establish a triable issue of fact, it may well "be impossible" for the court "to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted). In conducting such an assessment here, the district court recognized that it had to identify more than record ambiguity or incompleteness to conclude that Bentley's deposition testimony could not raise a genuine issue of fact as to notice. Rather, it had to find the record contradictions with Bentley's testimony "inescapable and unequivocal" to find that her testimony raised only "a sham issue of fact." *Fosamax Prods. Liability Litig.*, 707 F.3d 189, 194 (2d Cir. 2013).

14

In ourselves applying that standard, we emphasize at the outset that we consider only whether Bentley's deposition testimony regarding *notice* of sexist comments was properly rejected. AutoZone does not argue, and the district court certainly did not find, that Bentley failed to adduce sufficient evidence that Valentin repeatedly made sexist comments. Not only did Bentley testify to such comments at her deposition, but also, she and PSM Case had reported such comments to Antunes in their written statements of August 2014, and AutoZone fired Valentin on that basis. As to whether AutoZone had notice of these comments before August 2014, however, Bentley's deposition testimony is the only supporting evidence. For much the same reasons detailed by the district court, we conclude that Bentley's deposition testimony on this point is so compromised and contradicted that it cannot raise a genuine issue of fact as to notice. Rather than repeat the district court's thorough analysis, we here summarize the contradictions informing our decision.

First, there are serious contradictions in Bentley's own deposition testimony. Therein, she originally stated that, from January 2014 forward, she routinely sent Antunes contemporaneous text messages reporting each sexist statement as made by Valentin. Indeed, she testified to specifically recalling standing on the Wallingford sales floor when she sent the first text message. She subsequently recanted this testimony, however, when confronted with the record of her text messages to Antunes. Not one of these messages complains of sexist comments by Valentin—not even the text reporting his threat to slap Bentley. At her deposition, Bentley

15

acknowledged the omission, but explained that she had called—rather than texted—Antunes to report Valentin's sexist comments.

Even that claim, however, is contradicted by Bentley's earlier statements. Notably, in the August 2014 signed statement that Bentley provided Antunes, right after she detailed the content and frequency of Valentin's sexist remarks, Bentley was asked, "Did you report these comments?" and answered, "No." App'x 384. Bentley attempts to explain this apparent contradiction with her deposition testimony by professing to have understood the August inquiry to be asking only whether she had reported Valentin's sexist comments to her store manager.

To be sure, on summary judgment, a court should not disregard testimony if there is a plausible explanation for its contradiction by other evidence. *See Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete."). But Bentley's explanation is hardly plausible. Certainly nothing in the quoted question and answer, or anything else in the August written statement, would indicate to a reasonable person that the reporting inquiry was limited to the store manager. Indeed, given the fact that Bentley's August interview was conducted by Antunes—the very person to whom, at deposition, she claimed to have been routinely reporting Valentin's sexist comments—the interview question, "Did you report these

16

comments?" would reasonably be expected to prompt the answer, "Yes, to you," or at least the inquiry, "You mean, to anyone other than you?" Bentley's professed narrow understanding of the reporting inquiry is at odds not only with the unqualified nature of the question and common sense, but also with the notice at the bottom of each page of the signed statement, which advised that, "[b]y signing this statement form," Bentley was acknowledging that the answers she provided therein were "complete." App'x 383–90. It is further at odds with her negative response to another inquiry toward the conclusion of the statement, which asked, "Is there anything else that you want to include in this statement?" *Id.* at 389. In sum, Bentley's explanation for the contradiction between her deposition testimony and her August 2014 reporting denial is not plausible.

But even in the unlikely event that Bentley could have understood the August 2014 reporting inquiry to be asking only about the store manager, Bentley's negative response contradicts her deposition testimony claiming to have reported Valentin's sexist comments to the two persons who performed the store manager's responsibilities at Wallingford for much of the relevant time: district manager Campanile and East Haven store manager Mohamed.

In any event, there is still a third set of contradictions that Bentley cannot explain by professing misunderstanding as to the scope of the August 2014 reporting inquiry. These appear in her complaint in this action and in her discrimination filing with the Connecticut Commission on Human Rights. In both these filings, which are worded identically in pertinent part, Bentley details

17

various occasions when Valentin disparaged women. But she makes no mention of reporting these comments to anyone in AutoZone management before August 2014. Rather, the only reporting referenced in these filings is in September 2014: "In September 2014, [AutoZone] human resources employee, Nuno Antunes, asked [Bentley] whether she had any work complaints. [Bentley] told Antunes that Valentin threatened to slap her and repeatedly made sexist remarks to her." *Id*. at 3 (Complaint), 234 (Human Rights filing). Because Bentley's written statement documents this exchange with Antunes to have occurred in August—not September—2014, we assume this statement in the filings is off by one month. But nothing in the record admits an inference that Bentley alerted Antunes to Valentin's sexist behavior *before* August 2014.[6]

In sum, like the district court, we conclude that Bentley cannot rely on her deposition testimony to raise a genuine issue of fact about giving AutoZone notice of Valentin's sexist comments before August 2014 because that testimony is inescapably and unequivocally contradicted by her own sworn and written statements, and Bentley offers no plausible explanation for the multitude of contradictions.

---

[6] In seeking unemployment compensation, Bentley made no mention of reporting Valentin's sexist comments before August 2014. Indeed, in that filing, she states that she was discharged after reporting a PSM (presumably Case) for stealing in August 2014. She does not mention reporting Valentin at that time—although the fact that she did so is clearly established by her signed statement. We note this omission without giving it any weight, given the different focus of the proceeding.

18

With the record thus defined, we proceed to consider Bentley's challenge to the award of summary judgment in favor of AutoZone on each of her three claims.

## II.    Discrimination and Retaliation Claims

Bentley claims that AutoZone unlawfully discriminated against her in terminating her employment based on her sex. She further claims that AutoZone terminated her in unlawful retaliation for her complaining about sexual harassment by co-worker Valentin. Under the CFEPA, these claims are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for parallel federal claims under Title VII. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) ("The analysis of discrimination and retaliation claims under CFEPA is the same as under Title VII.").

Under the *McDonnell Douglas* framework, Bentley "bears the initial burden of establishing a prima facie case of discrimination." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) (internal quotation marks omitted). To carry that burden on summary judgment, Bentley must adduce sufficient evidence to permit a reasonable jury to find that (1) she is a member of a protected class, (2) she was qualified for the job at issue, (3) she was subjected to an adverse employment action, and (4) the circumstances of that adverse action give rise to an inference of discrimination based on her class membership. *See McDonnell Douglas Corp. v. Green*, 411 U.S. at 802.

19

To establish a *prima facie* case of retaliation sufficient to withstand summary judgment, Bentley must adduce evidence showing that (1) she engaged in protected activity, (2) the employer was aware of this activity, (3) she was subjected to an adverse employment action, and (4) a causal connection exists between the adverse action and her protected activity. *See Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002).

Where a *prima facie* showing—whether of discrimination or retaliation—is made, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802. If the defendant proffers such a reason, "the presumption raised by the *prima facie* case is rebutted and drops from the case." *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016) (internal quotation marks omitted). The plaintiff then bears the ultimate burden to show that the employer's proffered reason was merely a "pretext for an unlawful motive." *Craine v. Trinity Coll.*, 259 Conn. 625, 644 (2002); *see Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). A plaintiff may carry this burden by reference to the same evidence used to establish a *prima facie* case, provided that the evidence admits plausible inferences of pretext. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

As to discriminatory termination, AutoZone concedes for purposes of its summary judgment motion that Bentley adduced sufficient evidence to satisfy the first three elements of a *prima facie* case. Nevertheless, it argues that she failed to carry her burden as to

the fourth element because the fact that she was replaced by a woman will not admit an inference that Bentley's own termination was animated by sex-based bias. We need not discuss this argument because, even assuming its resolution in Bentley's favor, *see Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 353–54 (3d Cir. 1999) (observing that "even if a woman is fired and replaced by another woman, she may have been treated differently from similarly situated male employees"); *see also id.* at 354 (recognizing that female employee's replacement by another woman may have "some evidentiary force" in refuting sex discrimination claim) (quoted approvingly in *Brown v. Henderson*, 257 F.3d 246, 254 (2d Cir. 2001)), we would uphold the award of summary judgment at the final step of the *McDonnell Douglas* analysis.

AutoZone carried its second-step burden by pointing to a non-discriminatory reason for Bentley's discharge: her admitted use of especially crude language toward a co-worker. In urging pretext, Bentley submits that terminating an employee for such a one-time occurrence "does not pass the straight-face test." Appellant Br. at 16. In support, she cites *Stalter v. Wal-Mart*, 195 F.3d 285 (7th Cir. 1999), in which the Seventh Circuit characterized terminating an employee for "gross misconduct" based on eating another employee's potato chips as akin to "swatting a fly with a sledge hammer," *id*. at 290–91.

The circumstances are hardly comparable. The remark Bentley directed at Valentin was extremely crude and would not be tolerated in any workplace outside, perhaps, of a locker room. Further distinguishing this case from *Stalter*, Bentley has adduced no evidence

21

suggesting that she thought it permissible to make such a remark. *Cf. id.* (noting record evidence that plaintiff might have thought bag of chips had been abandoned). To the contrary, she has acknowledged that the remark was both inappropriate and expressly prohibited by company policy. Thus, she cannot urge pretext simply by questioning whether her misconduct was sufficiently severe to warrant termination. *See Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("'The court's role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments.'" (alteration omitted) (quoting *Byrnie v. Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001))); *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1226 (2d Cir. 1994) (stating that "courts must be careful not to second-guess an employer's business judgment" in firing employee; singular inquiry is whether termination was discriminatory).

Bentley further urges pretext by pointing to the purported disparate treatment of a comparator, specifically, Valentin. *See Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (recognizing that employer treatment of plaintiff less favorably than similarly situated person outside protected group can admit inference of discrimination). Bentley argues that while AutoZone fired her for a single offensive remark, it allowed Valentin to remain on the job despite repeated complaints about his sexist comments over a period of months. The argument fails because, assuming Valentin is an appropriate comparator, he was fired at the same time as Bentley, *i.e.*, in September 2014, following an investigation into both their conduct that was conducted in August 2014. While that investigation revealed

22

that Valentin had been making sexist comments for some time, there is no evidence from which a reasonable jury could find that AutoZone was aware of that fact before Bentley and Case reported it during the August 2014 investigation. Bentley's deposition testimony cannot raise a genuine issue of fact as to earlier notice for reasons stated in the preceding section of this opinion.

The same conclusion obtains with respect to Bentley's retaliatory discharge claim. While Bentley argues that retaliation can be inferred from the temporal proximity between her August 2014 reporting of Valentin's sexist comments and her September 2014 termination, such an inference can only satisfy her *prima facie* burden. It cannot demonstrate pretext. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (holding that "temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case . . . under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext"); *accord Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). In urging that "more" than temporal proximity here demonstrates pretext, Bentley reiterates her comparator argument. But as we have already noted, that argument depends on AutoZone's knowing of Valentin's sexist comments before August 2014, and the only evidence of such knowledge is Bentley's deposition testimony, which is so contradicted by other record evidence that it cannot raise a genuine issue of fact.

23

Accordingly, summary judgment was correctly granted in favor of AutoZone on Bentley's claims of both discriminatory discharge and retaliatory discharge.

### III.    Hostile Work Environment

In reviewing state law claims of discrimination based on a hostile work environment, Connecticut courts "look to federal case law for guidance." *Brittell v. Dep't of Corr.*, 247 Conn. 148, 164 (1998). That precedent instructs that a Title VII plaintiff complaining of a hostile work environment "must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive. The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted . . . ." *Id.* (internal quotation marks and citations omitted). Moreover, to hold an employer liable for such a hostile work environment, federal law requires the plaintiff to show "a specific basis for imputing the conduct creating the hostile work environment to the employer." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013) (internal quotation marks omitted). Two such bases exist: strict vicarious liability if an employer's supervisor has created the hostile environment, *see Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 113 (2d

Cir. 2015); and negligence if a co-worker who is not a supervisor has created the hostile environment, and the employer, upon becoming aware of the misconduct, fails to remedy it, *see Summa v. Hofstra Univ.*, 708 F.3d at 124. We consider Bentley's hostile work environment claims against AutoZone on both theories.

## A. Strict Vicarious Liability

Bentley claims that AutoZone is strictly liable for the hostile work environment created by Valentin because Valentin was a supervisor. Assuming that a reasonable jury could find that Valentin's sexist comments were "sufficiently severe or pervasive" as "to alter the conditions of [Bentley's] employment and create an abusive working environment," *Raspardo v. Carlone*, 770 F.3d at 114 (internal quotation marks omitted), the record evidence would not permit it to find that Valentin was a supervisor. That conclusion is dictated by *Vance v. Ball State University*, 570 U.S. 421 (2013).

In *Vance*, the Supreme Court resolved a circuit split. "Some courts [had] held that an employee is not a supervisor unless he or she has the power to hire, fire, demote, promote, transfer, or discipline the victim"; other courts had "substantially followed the more open-ended approach advocated by the EEOC's Enforcement Guidance, which tie[d] supervisor status to the ability to exercise significant direction over another's daily work." *Id.* at 430–31. The Supreme Court rejected the latter position, holding that "[t]he ability to direct another employee's tasks is simply not sufficient" to make one a supervisor. *Id.* at 439. Rather, an employee is a supervisor only "when the employer has empowered that employee to take tangible

25

employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 431 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). The hallmark of the tangible employment action thus used to identify a supervisor is its potential "to inflict direct economic injury." *Id.* at 440. As the Supreme Court explained in *Vance*, "[o]nly a supervisor has the power to cause 'direct economic harm' by taking a tangible employment action," and it is "because a supervisor has that authority—and its potential use hangs as a threat over the victim— that vicarious liability . . . is justified." *Id.*; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. at 762 (observing that "supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control").

These principles dictate that for Bentley to raise a triable issue of fact as to Valentin being a supervisor, she had to adduce admissible evidence showing that AutoZone had authorized Valentin to do more than oversee her day-to-day performance of assigned tasks. It had to have authorized Valentin to take *tangible employment actions* that could *inflict direct economic injury.* She has not done so.

The record evidence shows that Valentin could not hire, fire, promote, or demote employees. Nor could Valentin set employees' compensation or even their work hours. Such scheduling could only be done by a store manager, and with that position unfilled at

26

Wallingford, employee work hours at that store were set by East Haven store manager Mohamed. Thus, while Bentley and Case told Antunes in their August interviews that Valentin had threatened to cut Bentley's hours, to send her home, and even to fire her, there is no record evidence that AutoZone, in fact, ever empowered Valentin to take such actions. *See*, *e.g.*, *Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 271 (1st Cir. 2014) ("The extent of a worker's authority is determined . . . by an examination of actual authority." (internal quotation marks omitted)). Nor is there any evidence that Valentin ever took such actions, or *any* actions that diminished Bentley's or any other employee's earnings. While district manager Campanile testified that Valentin had "the authority to discipline Ms. Bentley if the circumstances warranted it," App'x 346, he also testified that Valentin could not formally discipline Bentley, alter her hours, or change her compensation. Indeed, the record shows that to the extent Bentley was disciplined—specifically, with warnings or violation notices for absence or tardiness—that discipline was initiated by someone at the store manager level or higher, even though such actions appear not to have had any adverse economic consequences for the employee. Meanwhile discipline resulting in termination could only be ordered by someone at a still higher level, as occurred when regional manager Blank, on the recommendation of HR manager Antunes, fired Bentley, Valentin, and Case.

In sum, the record evidence would not permit a reasonable jury to find that Valentin had the sort of disciplinary authority that could cause Bentley economic injury, without which he could not be identified as a "supervisor" for purposes of vicarious liability. *See*

27

*Vance v. Ball State Univ.*, 570 U.S. at 437 n.9 (stating that employee's disciplinary or reassignment authority must have "economic consequences" for him to be identified as a supervisor).[7]

## B. Negligence

Where a hostile work environment is created by a co-worker who is not a supervisor, the employer can still be liable, but "only for its own negligence." *Summa v. Hofstra Univ.*, 708 F.3d at 124 (internal quotation marks omitted). To demonstrate such negligence, a plaintiff must adduce evidence "that the employer failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Id.* (internal quotation marks omitted); *see Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004) (stating that where "employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers," employer's liability depends on plaintiff showing that "employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action").

Bentley insists that record evidence here shows that AutoZone knew of Valentin's persistent sexist comments for many months

[7] We note that in a recent unpublished order, the Sixth Circuit held that even AutoZone store managers, who outrank PSMs, are not supervisors under *Vance. See Equal Emp't Opportunity Comm'n v. AutoZone, Inc.*, 692 F. App'x 280, 283 (6th Cir. 2017). That question is not before us on this appeal.

without taking any remedial action. But the only evidence supporting that claim is her own deposition testimony, which we have already concluded is so contradicted and inconsistent that it cannot raise a genuine issue of fact as to notice. Absent that testimony, the record evidence shows that AutoZone learned of Valentin's sexist comments only in August 2014, when first reported by Case and then confirmed by Bentley. An investigation promptly ensued, resulting in Valentin's termination. On this record, no reasonable jury could find AutoZone liable in negligence for a hostile work environment created by Valentin.

In sum, because Bentley failed to adduce evidence that would allow a reasonable jury to find AutoZone liable for a hostile work environment based on sex on either a strict vicarious liability or negligence theory, the district court correctly ordered summary judgment in favor of AutoZone on this claim.

## CONCLUSION

To summarize, we conclude as follows:

1. Summary judgment was correctly entered in favor of AutoZone on Bentley's Connecticut claims of discriminatory discharge based on sex, retaliatory discharge for reporting sexual harassment, and a sex hostile work environment because Bentley failed to adduce sufficient evidence from which a reasonable jury could resolve any of these claims in her favor.

2. The district court correctly concluded that Bentley's own deposition testimony could not raise a genuine issue of fact as to

29

AutoZone's having notice of Bentley's sexual harassment by a co-worker before August 2014 because that testimony was unequivocally contradicted by Bentley's own earlier sworn and written statements, and she failed plausibly to explain the numerous contradictions.

3. The district court also correctly concluded that Bentley raised no genuine issue of fact as to the harassing co-worker being a "supervisor," as required for AutoZone to be strictly vicariously liable for any ensuing hostile work environment. The record evidence showed that, although AutoZone had authorized the co-worker to direct Bentley's performance of day-to-day tasks, it had not authorized him to take any "tangible employment actions" that could "inflict direct economic injury." *Vance v. Ball State Univ.*, 570 U.S. at 440, 453.

Accordingly, we AFFIRM the judgment of the district court.